BLANK ROME LLP
Ana Tagvoryan (admitted *pro hac vice*)
atagvoryan@blankrome.com
Harrison Brown (admitted *pro hac vice*)
hbrown@blankrome.com
Dustin Moaven (pending admission *pro hac vice*)
dmoaven@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone:    424.239.3400
Facsimile:    424.239.3434

KRAVITZ, SCHNITZER & JOHNSON, CHTD.
Gary Schnitzer (Nevada Bar No. 395)
gschnitzer@ksjattorneys.com
8985 S. Eastern Avenue, Suite 200
Las Vegas, Nevada 89123
Telephone:    702.362.6666
Facsimile:    702.362.2203

Attorneys for
TOMORROW ENERGY CORP.
fka SPERIAN ENERGY CORP.

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ANDREW PERRONG and JAMES EVERETT SHELTON, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>        vs.<br><br>TOMORROW ENERGY CORP fka SPERIAN ENERGY CORP, a Nevada corporation, and ENERGY GROUP CONSULTANTS, INC., a Kansas corporation, BAETYL GROUP LLC, a Texas limited liability company,<br><br>                    Defendants.<br><br>Related Cross-Claims and Third Party Claims. | Case No. 2:19-cv-00115-RFB-EJY<br><br>**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY TOMORROW ENERGY CORP. FKA SPERIAN ENERGY CORP.** |

123430505

# **TABLE OF CONTENTS**

I.      Introduction. ...........................................................................................................5

II.     Material Facts Not Genuinely Disputed by Plaintiffs. ...........................................5

III.    Plaintiffs Fail to Identify a Genuine Dispute as to the Lack of "Actual Authority to Place the Unlawful Calls." ..................................................................................7

      A.      The Vendors Did Not Have Implied Actual Authority to Place Unlawful Calls. ..........8

            1.      Plaintiffs Have Never Before Raised an "Implied Actual Authority" Theory of Vicarious Liability. ..........................................................8

            2.      Plaintiffs' Implied Actual Authority Theory Does Not Save Their Claims Against Sperian. ...................................................................9

      B.      Vendors Did Not Have Express Actual Authority "to Place the Unlawful Calls." ...............................................................................................................15

IV.    The Vendors Did Not Have Apparent Authority to Place Unlawful Calls. ...........................17

      A.      Plaintiffs Do Not Show the Restatement Applies. ...........................................17

      B.      The FCC's Dish Factors Are Not Met. ............................................................17

      C.      Plaintiffs' Analysis Is Incomplete: They Fail to Discuss How They Relied on Any Manifestations by Sperian. ...................................................................19

V.     There Is No Evidence to Suggest Sperian Ratified Unlawful Conduct. ...........................20

      A.      Plaintiffs Fail to Show That Sperian Knowingly Accepted a Benefit from the Vendors' Alleged Unlawful Calls. ...............................................................20

            1.      Plaintiffs Do Not Identify the "Benefit" Sperian Supposedly Accepted. .........20

            2.      The Evidence Cited by Plaintiffs Does Not Support Their Contention That Sperian Knowingly Allowed Unlawful Calls by Vendors. ....................21

      B.      Plaintiffs Fail to Show That Sperian Was Willfully Ignorant of Unlawful Conduct by the Vendors. ...............................................................................23

VI.    Conclusion. ...........................................................................................................24

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aranda v. Caribbean Cruise Line, Inc.*,
  179 F. Supp. 3d 817 (N.D. Ill. 2016) ...........................................................9, 10, 11, 21

*Armstrong v. Investor's Bus. Daily, Inc.*,
  No. 18-2134, 2020 WL 2041935 (C.D. Cal. Mar. 6, 2020) ......................................15, 16

*Bank of the W. v. Great Falls Ltd. P'ship*,
  No. 09-00388, 2011 WL 13248501 (D. Nev. Sept. 1, 2011) .....................................10, 11

*Bridgeview Health Care Ctr., Ltd. v. Clark*,
  816 F.3d 935 (7th Cir. 2016) ....................................................................... *passim*

*Canary v. Youngevity Int'l, Inc.*,
  No. 18-03261, 2019 WL 1275343 (N.D. Cal. Mar. 20, 2019) ...................................8, 9

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...................................................................................................8

*Coblentz v. Riskin*,
  74 Nev. 53, 322 P.2d 905 (1958) ..............................................................................10

*Henderson v. United Student Aid Funds, Inc.*,
  918 F.3d 1068 (9th Cir. 2019), *as amended on denial of reh'g and reh'g en banc*
  (May 6, 2019)................................................................................................9, 11, 24

*Jones v. Royal Admin. Servs., Inc.*,
  887 F.3d 443 (9th Cir. 2018) ............................................................................8, 15, 16

*Klee v. United States*,
  53 F.2d 58 (9th Cir. 1931) .........................................................................................8

*Krakauer v. Dish Networks L.L.C.*,
  14-333, 2017 WL 2455095 (M.D.N.C. June 6, 2017) .............................................9, 17

*Kristensen v. Credit Payment Servs., Inc.*,
  879 F.3d 1010 (9th Cir. 2018) .................................................................................24

*Linlor v. Five9, Inc.*,
  No. 17-218, 2017 WL 5885671 (S.D. Cal. Nov. 29, 2017)..........................................8

*Lushe v. Verengo Inc.*,
  No. 13-07632, 2014 WL 5794627 (C.D. Cal. Oct. 22, 2014).................................9, 16, 17

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
  873 F.3d 1045 (9th Cir. 2017) .....................................................................................9

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

*Meeks v. Buffalo Wild Wings, Inc.*,
   No. 17-07129, 2018 WL 1524067 (N.D. Cal. Mar. 28, 2018) .......................................................8

*Mey v. Venture Data*,
   245 F. Supp. 3d 771 (N.D. W. Va. 2017) ...............................................................................19, 20

*N.L. v. Credit One Bank, N.A.*,
   No. 17-01512, 2018 WL 5880796 (E.D. Cal. Nov. 8, 2018)..............................................16

*NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*,
   124 F.3d 1094 (9th Cir.1997) .............................................................................................20

*Reese v. Jefferson Sch. Dist. No. 14J*,
   208 F.3d 736 (9th Cir. 2000) ...............................................................................................9

*Salyers v. Metro. Life Ins. Co.*,
   871 F.3d 934 (9th Cir. 2017) ........................................................................................10, 15

*In the Matter of the Joint Petition Filed by Dish Network, LLC, et al.*,
   28 F.C.C. Rcd. 6574 (2013)...........................................................................................18, 19

*Thomas v. Taco Bell Corp.*,
   879 F. Supp. 2d 1079 (C.D. Cal. 2012),
   *aff'd*, 582 F. App'x 678 (9th Cir. 2014) ...........................................................................8, 16

*Thomas v. Taco Bell Corp.*,
   582 F. App'x 678 (9th Cir. 2014) ..................................................................................16, 20

*U.S. v. Milovanovic*,
   678 F.3d 713 (9th Cir 2012) ................................................................................................9

**Statutes**

47 U.S.C. § 227 (the "TCPA") ..................................................................... *passim*

**Other Authorities**

Restatement (Second) of Agency § 265.......................................................................20

Restatement (Third) Of Agency § 2.02.......................................................................13

Restatement (Third) of Agency § 3.03 .......................................................................17

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

# I.      INTRODUCTION.[1]

Under Plaintiffs' theory of liability, there is nothing that a business who engages third party telemarketers can do to avoid liability. Plaintiffs argue if the business takes a hands-off approach and merely requires its contractors to comply with the TCPA, the business is guilty of not doing enough. If the business implements policies and procedures, and monitors the contractors' acts, then the business controlled the contractors' telemarketing practices. The only thing that would possibly save a company, then, is for the company to never do business with third party service providers. Plaintiffs' "damned if you do, damned if you don't" theory of liability is not the law.

Furthermore, Plaintiffs' conclusions are not supported by the actual facts revealed during discovery. The undisputed facts show that Sperian enforced policies which were reasonably designed to mitigate against potential TCPA violations. Among other things, Sperian required that the EGC Parties and Baetyl submit proposed call lists to Sperian for approval, and restricted New Wave and Vestra to opt-in or warm transfer calls. The undisputed facts show that as soon as Sperian learned of alleged acts of non-compliance, it investigated those acts, sent warning letters to its Vendors, and demanded and received assurances of corrective action. Finally, the undisputed facts show that Sperian did not accept any benefit conferred by the alleged unlawful calling practices. Nor did Sperian pay its Vendors in a way that would encourage non-compliance. Sperian paid its Vendors for sales, not calls, and clawed back commissions for any non-compliant sale. There was no incentive for any Vendor to blindly work through the phone book, as Plaintiffs suggest.

The disputes which Plaintiffs raise in Opposition (Dkt. No. 155 ("Opp.")) to this evidence are not genuine. Plaintiffs misquote or misconstrue testimony, exhibits, and the arguments raised by Sperian, and attempt to obfuscate issues by citing evidence which is not even tangentially related to the issues herein. Accordingly, Sperian is entitled to summary judgment in its favor.

# II.      MATERIAL FACTS NOT GENUINELY DISPUTED BY PLAINTIFFS.

Plaintiffs do not dispute that Sperian interviews vendors for TCPA compliance during the "vetting" and onboarding process. (*See* Opp.; Deposition Transcript of Edgar Moya (attached to

---

[1]  Except as stated herein, all capitalized terms carry the same definitions assigned in Sperian's Motion for Summary Judgment (the "Motion" or "Mot."), Dkt. No. 150.

Sperian's Supplemental Appendix as Exhibit AI), 58:20-65:10 [SPERIANMSJ000264-271.) While the vendor contracts do not mention the TCPA specifically, they do mention compliance with all state and federal laws and regulations. (*See, e.g.*, Ex. B [MSA with EGC], at § 8 [SPERIANMSJ000013].) In addition, each of the two Vendors with whom Sperian contracted for outbound calls—the EGC Parties and Baetyl—were required to, and did, submit proposed lead lists to Sperian. (Ex. A, ¶¶ 7, 8 and 19 [SPERIANMSJ000004]; Ex. R), 66:23 – 69:25 [SPERIANMSJ000147-150].) Sperian's policy was to "scrub" phone numbers from the lists using several criteria, including removing cellular phone numbers, numbers on the federal and state do-not-call ("DNC") registries, and numbers of current customers. (Ex. A, ¶¶ 3, 4, 7 and 8 [SPERIANMSJ000003-4]; Ex. B at § 16 [SPERIANMSJ000011-20].) The EGC Parties and Baetyl were authorized only to call numbers on the "approved" lists. (Ex. A, ¶ 7 [SPERIANMSJ000004]; Ex. Z, Resp. No. 6 [SPERIANMSJ000210-211].) And, neither Plaintiffs' phone number appeared on any approved list Sperian sent to the Vendors. (*See* Opp. at 4:16-17.)

In addition to providing approved lead lists, Sperian had a practice of "auditing" Vendors, including sampling the phone numbers of completed outbound sales calls to ensure that those numbers appeared on approved lead lists. (Ex. A, ¶ 15 [SPERIANMSJ000006].) Similarly, with respect to "opt-in" calls, Sperian obtained random samples of call recordings from the Vendors to perform audit checks to confirm the call was an inbound call or warm transfer on the front-end. (Ex. A, ¶ 15 [SPERIANMSJ000006] and Ex. H) [SPERIANMSJ000074-78].) Call logs were also asked for on an as-needed basis. (*See* Ex. 2, 180:16-181:12; Ex. 13.) In addition, while unrelated to the method and manner of calling a prospect, Sperian would request random samples of call recordings from Vendors to audit calls for quality assurance with reference to the call script guidelines. (Ex. A, ¶ 17 [SPERIANMSJ000006-000007]; Ex. J [SPERIANMSJ00082-000083].)

Sperian also required all sales be verified by a third party, TPV.com. (Ex. A, ¶¶ 13 and 14 [SPERIANMSJ000005-6].) TPV.com confirmed the customer understood what she was buying and the terms of the sale. (*Id.*) When the customer acknowledged both, gave clear consent to enroll with Sperian, and was enrolled with Sperian by the utility company, the sale was deemed valid. (*Id*; *see*, e.g., Ex. C ("A valid sale is defined as a prospect that has given clear consent to enroll with

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

Tomorrow Energy, completed a satisfactory third-party verification (TPV) and been enrolled for service with Tomorrow Energy by the utility.").) The "portal" referenced by Plaintiffs is TPV.com's portal, not Sperian's, to which sales agents can go to access sales activity. (*See* Opp. at 7, citing Ex. 2, 161:7-162:10.) Plaintiffs' evidence does not show that Sperian could use TPV.com to block phone numbers from being called. At most, Sperian could block zip codes, addresses, and agent IDs on TPV.com, including all agents from a given call center. (*See* Opp. 3:22-43 (citing Ex. 2, 212:9-214:25, 251:25-255:5; and Exs. 14-16).)

Contrary to Plaintiffs' assertion, not all of the Vendors had "multiple complaints." For example, Plaintiffs fail to demonstrate any prior non-compliance issues by Baetyl; the call Shelton says he received was the first instance of alleged wrongdoing by Baetyl. (*See* Opp. Pp. 12:15-22; citing Mot. at 19:3-5, Ex. 41, and Ex. 42.) It is also undisputed that Sperian suspended New Wave at least twice, as a result of its audits, and not complaints. (*See* Opp. p. 13:8-12.) Lastly, Sperian terminated Vestra after it received a complaint unrelated to either named Plaintiff. (Ex. 2, 285:10-286:16; Ex. A, ¶ 6.)[2]

## III.   PLAINTIFFS FAIL TO IDENTIFY A GENUINE DISPUTE AS TO THE LACK OF "ACTUAL AUTHORITY TO PLACE THE UNLAWFUL CALLS."

In their Opposition, Plaintiffs argue that "Sperian does not really challenge the fact that the Vendors and Sperian had an agency relationship, nor could it." (Opp., p. 19.) Plaintiffs contend that "[t]he question of agency 'should be submitted to the jury unless the facts are clearly insufficient to establish agency or there is no dispute as to the underlying facts.'"  (Opp., p. 17 (citation omitted).) This is wrong. The existence or assertion of an agency relationship (which Sperian does not concede) is not enough to preclude summary judgment. Plaintiffs must also show that Sperian actually authorized unlawful calls.

---

[2] Plaintiffs contend that Sperian's Vendors spliced or fabricated call recordings. (Opp., p. 5-6.) However, such assertion is irrelevant for purposes of this phase of the case. It is undisputed that Sperian did not place any calls itself. Sperian received copies of recordings from Vendors and had no knowledge that the recordings which were provided are not genuine. Sperian merely presented the recordings it received to show that, at this stage, Sperian has been unable to independently verify Plaintiffs' contentions that they were called by the Vendors. Whether Plaintiffs called the Vendors or otherwise invited calls by the Vendors is concerning, but can be fleshed out in Phase II of this bifurcated proceeding if the Court does not grant summary judgment to Sperian.

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

As one court recently explained:

'Agency means more than mere passive permission; it involves request, instruction, or command.' *Meeks v. Buffalo Wild Wings, Inc.*, 2018 WL 1524067, at *6 (quoting *Klee v. United States*, 53 F.2d 58, 61 (9th Cir. 1931) ); *see also Thomas* [*v. Taco Bell Corp*]., 879 F. Supp. 2d [1079,] 1085 [(C.D. Cal. 2012), *aff'd*, 582 F. App'x 678 (9th Cir. 2014)] (holding that defendant could not be held vicariously liable for alleged TCPA violations because the defendant did not exercise control over the 'manner and means' by which a text message campaign was designed and executed); *Linlor v. Five9, Inc.*, No. 17-218, 2017 WL 5885671, at *3 (S.D. Cal. Nov. 29, 2017). In order to establish agency liability for a TCPA violation, **a plaintiff 'must do more than establish an agency relationship.'** *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 449 (9th Cir. 2018). **A plaintiff 'must also establish actual authority to place the unlawful calls.'** *Id.*

*Canary v. Youngevity Int'l, Inc.*, No. 18-03261, 2019 WL 1275343, at *5 (N.D. Cal. Mar. 20, 2019) (bold emphasis added). Thus, assuming *arguendo* that there was an agency relationship, the Vendors exceeded the scope of their agency and acted without authority when they caused calls to be made to certain phone numbers and in a manner that would violate the TCPA.

### A. The Vendors Did Not Have Implied Actual Authority to Place Unlawful Calls.

#### 1. Plaintiffs Have Never Before Raised an "Implied Actual Authority" Theory of Vicarious Liability.

Plaintiffs assert that "Sperian fails to address Plaintiffs' theory of agency which alleges that the Vendors and subcontractors had 'implied actual authority' to place the calls due to Sperian's acquiescence," and contend "the Court should not consider any new argument and evidence that Sperian may proffer on this theory in its reply…" (Opp., p. 18 and n. 5.) There are many problems with this argument, not the least of which is that Plaintiffs never raised an "implied actual authority" theory of liability at any point in this case. The current record is devoid of the term "implied actual authority," and even the word "implied" is nowhere to be found in any of Plaintiffs' three pleadings.

Moreover, the party moving for summary judgment bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On an issue as to which the nonmoving party has the burden of proof, the moving party can prevail merely by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case. *Id.* To successfully rebut a motion for summary judgment, the nonmoving party must point to facts

supported by the record that demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). In its opening brief, Sperian demonstrated that it was not directly or vicariously liable for any Vendors' calls to the named Plaintiffs. Having done so, the burden shifts to Plaintiffs to demonstrate a genuine triable issue of liability as to those calls. No "sub-theory" or issue of vicarious liability is outside the scope of the opening brief. Thus, Sperian did not concede implied actual authority exists or somehow waived the ability to rebut it.

### 2. Plaintiffs' Implied Actual Authority Theory Does Not Save Their Claims Against Sperian.

No court within the Ninth Circuit has applied the theory of implied actual authority to TCPA claims. The term "implied actual authority" appears in only one TCPA case in the Ninth Circuit, but it was not material to the decision. In *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073, 1076 (9th Cir. 2019), *as amended on denial of reh'g and reh'g en banc* (May 6, 2019), the court observed that the plaintiff advanced an implied actual authority theory in opposition to the defendant's motion but, since the court found that a triable issue as to ratification existed, the court did not address whether implied actual authority is a viable theory of liability for TCPA claims. The only intra-Ninth Circuit cases referenced in the implied actual authority section of Plaintiffs' Opposition—*Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045 (9th Cir. 2017), *U.S. v. Milovanovic*, 678 F.3d 713 (9th Cir 2012), and *Lushe v. Verengo Inc.*, No. 13-07632, 2014 WL 5794627 (C.D. Cal. Oct. 22, 2014)—do not even contain the word "implied."

Unsurprisingly then, Plaintiffs rely on out-of-circuit authority for their implied actual authority arguments. But *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935 (7th Cir. 2016) and *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817 (N.D. Ill. 2016), cited by Plaintiffs at page 18 of their Opposition, are not binding on this Court. *See, e.g., Canary*, 2019 WL 1275343, at *6 n.7 (noting the court is not bound to follow *Aranda*). Nor is *Krakauer v. Dish Networks L.L.C.*, 14-333, 2017 WL 2455095 (M.D.N.C. June 6, 2017), which Plaintiffs advance only for the unremarkable proposition that the existence of a contract which refers to one party as an independent contractor is not dispositive of the lack of actual authority. (Opp., p. 20.)

Even if this Court is to become the first court within the Ninth Circuit to apply implied actual authority to TCPA claims, it should not adopt Plaintiffs' flawed recitation of that theory of liability. Citing *Bridgeview* and *Aranda*, Plaintiffs contend that "[a] principal grants implied actual authority to an agent when its reasonably interpreted words or conduct would cause an agent to believe that the principal consents to have an act done on her behalf." (Opp., p. 18.) This is incomplete. When courts within the Ninth Circuit have considered implied actual authority with respect to other types of claims, they have considered two additional elements in their analyses.

"Implied actual authority exists where the agent reasonably believes she has authority based on representations made by the principal or acts of the agent allowed by the principal over a course of time." *Bank of the W. v. Great Falls Ltd. P'ship*, No. 09-00388, 2011 WL 13248501, at *4 (D. Nev. Sept. 1, 2011) (citing *Coblentz v. Riskin*, 74 Nev. 53, 56, 322 P.2d 905, 907 (1958)). "Implied actual authority comes from a general statement of what the agent is supposed to do; an agent is said to have the implied authority to do acts consistent with that direction." *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017). Three elements are required for Plaintiffs' implied actual authority theory. (1) In both the Seventh Circuit and Ninth Circuits, a plaintiff must show that the agent believed it had the principal's authority to engage in unlawful acts. But in the Ninth Circuit, a plaintiff must also show that (2) multiple representations or acts "over a course of time" caused the agent to believe it had the principal's authority, and (3) that the agent's acts were consistent with the principal's direction. There is no triable issue as to any of these elements.

### a. Plaintiffs Do Not Introduce Any Evidence of the Vendors' Reasonable States of Mind.

To succeed with a theory of implied actual authority, Plaintiffs must demonstrate that the Vendors reasonably believed that Sperian authorized unlawful calls. Plaintiffs fail to establish what the Vendors believed, much less identify a triable issue as to the Vendors' beliefs.

In *Bank of the West*, the defendants alleged they reached a settlement agreement with the plaintiff, the Bank, and petitioned the court to enforce the agreement. 2011 WL 13248501, at *1. The defendants argued that the agreement was reached between the bank and the defendants independent of counsel, and alternatively that counsel for the bank, Klundt, who had authority to

123430505

10

settle, formed a contract with counsel for the defendants. *Id.* After discussing express authority (and finding there was none because, among other things, the term sheets required a written agreement with the signatures of the parties, not the attorneys), the court turned to the defendants' implied actual authority theory. *Id.* at *3-4. In rejecting the defendants' implied actual authority theory, the court emphasized the importance of the agent's beliefs: "Klundt held no belief that he had any authority from Bank, nor is there any indication that acts over time led him to believe that he had such authority. [Thus] Klundt had no implied authority to settle." *Id.* at *4.

And though the court in *Henderson* did not reach the issue of implied actual authority, the dissent did, and it stressed that the plaintiff would have been required to provide proof of the agents' beliefs in order to prevail on her implied actual authority theory. But, the plaintiff presented "no evidence in this record from any debt collector [agent] as to what the debt collector believed about USA Funds [principal] or why that belief was reasonable." 918 F.3d at 1082. The plaintiff's argument that the debt collectors reasonably believed, based on the principal's manifestations and actions, that they "had authority to act as USA Funds' agent in all aspects of the transactions with debtors" amounted to mere "speculative assertions" in light of the fact that "the only evidence in the record is that Navient [intermediary] would withhold payment or cease working with the debt collectors if TCPA violations occurred." *Id.*

Even Plaintiffs' out-of-circuit authorities underscore the importance of proof of the Vendors' reasonable states of mind. In *Bridgeview*, the Seventh Circuit found it "impossible to conclude that implied actual authority exists" when, although the defendant gave authority for fax marketing to local businesses, "[n]othing about fax marketing inherently calls for sending thousands of advertisements … [or] inherently demands sending these ads to states where the advertiser does not do business." 816 F.3d at 939. In *Aranda*, by contrast, the court found that there could be implied actual authority where the plaintiff produced evidence that the agreement between the defendant and the agent required the agent to provide the defendant with an exact telephone script and audio file of each survey, the defendant's attorneys proposed edits to the survey script before being used, and "other evidence in the record [showed] that [the defendant] authorized the call campaign and had control over the manner and means by which [the agent] conducted it." 179 F. Supp. 3d at 832.

Plaintiffs do not offer any evidence that the EGC Parties, who made outbound calls for Sperian, believed Sperian authorized the dialing of numbers not on approved lists. To the contrary, the EGC Parties admitted, several times, that the EGC Parties knew they were not permitted to call any numbers not on an approved list.[3]

The record also contains numerous instances where the EGC Parties acknowledged that they had run afoul of Sperian's instructions. (E.g., Ex. S, 161:7-162:9 [SPERIANMSJ000178-179] ("This particular scenario – well, what I know about this particular scenario is that we had a subcontractor that dialed on the Do Not Call list."); Ex. L [SPERIANMSJ000088-92] ("With this change, we will no longer have a lag in recording providing, no more potential DNC issues…We will clean this up and continue to grow."); Ex. N [SPERIANMSJ000096-97] ("I am fine getting rid of the problem centers (as you see I already have removed a couple)…Let me know if cleaning up the bad apples, setting new systems to ensure new bad apples can not [sic.] appear, and continuing to grow the production are acceptable."); Ex. AG [SPERIANMSJ000248-251].)

Plaintiffs do not identify any evidence of the states of mind of Baetyl, who was also required to submit proposed lead lists to Sperian and receive Sperian's approval before making any outbound calls, or New Wave and Vestra, who were not permitted to place outbound calls at all. According to Plaintiffs, "by not visiting a call center" and "by not requesting a document," Sperian implied "that they don't care." (Opp., p. 22.) Whether Sperian "cared" about visiting a call center or requesting certain documents is not a substitute for proof that the Vendors believed Sperian authorized illegal calls. "Speculative assertion" is insufficient to defeat summary judgment.

---

[3] In their Answer to Plaintiffs' Second Amended Complaint (Dkt. No. 70), the EGC Parties denied Mr. Perrong's allegations that "Sperian is legally responsible for ensuring that [the EGC Parties] complied with the TCPA" (¶ 95), that "Sperian knowingly and actively accepted business that originated through the illegal telemarketing calls from [the EGC Parties]" (¶ 95), "by accepting these contacts, [the EGC Parties] 'manifest[ed] assent or otherwise consent[ed] ... to act' on behalf of Sperian, as described in the Restatement (Third) of Agency" (¶ 98), and that "Sperian maintained interim control over [the EGC Parties'] actions" (¶ 99). In denying these particular allegations, the EGC Parties concede that they alone were responsible for the calls they placed, and that Sperian did not do anything to cause the EGC Parties to believe they had authority to place the calls.

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

### b.   Plaintiffs Do Not Show a Pattern of Conduct "Over a Course of Time."

With no evidence that Vendors believed that Sperian actually authorized unlawful calls,[4] Plaintiffs are forced to argue that "[a] jury could also conclude from Sperian's acquiescence to the callers' conduct that the Vendors reasonably believed Sperian consented to the tactics it was using to sell Sperian's products…" (*Id.*) Plaintiffs' allegations are contrived and only reached by ignoring evidence and mischaracterizing Mr. Moya's testimony.

First, Plaintiffs charge that Mr. Moya admitted he knew about multiple telemarketing violations but took no action. (*Id.*, p. 21.) The deposition excerpts cited by Plaintiffs, however, do not support the conclusion that Sperian repeatedly, over a course of time, took no action. The testimony shows that Sperian notified the EGC Parties and launched an investigation when it learned that the EGC Parties had called a telephone number not on an approved list. (Ex. R, 189:9-191:8 [SPERIANMSJ000152-154]; 195:11-198:16 [SPERIANMSJ000155-158].) While the investigation was pending, Sperian received another complaint related to a call which took place prior to the first complaint. (*Id.*) The record shows that Sperian demanded, and received, an action plan and the EGC Parties' assurances that the EGC Parties had "full control over what leads are dialed, all recording and monitoring access and full control over who is dialing daily" and the EGC Parties assured Sperian that the EGC Parties had terminated the agent who placed the calls as well as the call center that allowed the calls." (*Id.*; Ex. L [SPERIANMSJ000088-92].) Sperian terminated the EGC Parties when, despite their assurances of corrective action and "full control," the EGC Parties called Mr. Perrong. (Ex. A, ¶ 3 [SPERIANMSJ000003].)

Second, Plaintiffs argue that after Sperian learned of telemarketing violations, it "amended the Vendors' contracts to provide for higher commissions and paid substantial bonuses tied to high

---

[4] In support of this theory, Plaintiffs offer a quote which they say comes from the Restatement (Third) Of Agency § 2.02, comment c: "While express actual authority is proven through words, implied actual authority is established through circumstantial evidence." (*See* Opp., p. 20.) <u>This sentence does not appear in the Restatement</u>. It comes from the out-of-circuit decision in *Bridgeview*. 816 F.3d at 939. To be sure, the Restatement does say that implied authority can be "proved on the basis of a principal's conduct other than written or spoken statements that explicitly authorize an action." Rest. (3d) of Agency § 2.02, cmt. c. As set forth in this section, Plaintiffs do not show a pattern of conduct by Sperian over a course of time sufficient to establish implied actual authority.

1   sales volumes." (Opp., p. 21.) But there is nothing in the record which ties these changes specifically

2   to the alleged unlawful calls. Indeed, Plaintiffs omit that Mr. Moya testified that these changes were

3   not related to the same type of call. Rather, Sperian increased the lengths (and, consequently, the

4   price) of the contracts its Vendors would be selling and, accordingly, Sperian increased the

5   commissions to reflect that change. (Ex. 2, 300:8-18 [PLAINTIFFSMSJ_000096].)

6       Plaintiffs acknowledge Sperian's "disciplinary" actions but attempt to dismiss them as "too

7   late" and "reactionary," and charge that "Sperian fired EGC and Baetyl, but only after their agents

8   made calls to Plaintiffs, known TCPA litigators who filed suit." (Opp., p. 21.) Plaintiffs improperly

9   group the various Vendors. As to the EGC Parties, far from acquiescing to unlawful calls, each time

10  Sperian learned of potential issues of non-compliance, Sperian "reacted." As to Baetyl, Sperian had

11  only just begun working with Baetyl when it learned that Baetyl had called Mr. Shelton. (Ex. C

12  [SPERIANMSJ000022-34]; Ex. 41 [PLAINTFFSMSJ_000324-332].) Plaintiffs do not cite any prior

13  history of non-compliance by Baetyl to which Sperian sat idly by, because there was none. Plaintiffs

14  also suggest Sperian received multiple complaints of illegal calls associated with each vendor,

15  however there is no such evidence of prior complaints regarding Baetyl, and New Wave was

16  suspended as a result of Sperian's own audit and diligence, not a complaint. (Ex. 2, 285:10-286:16.)[5]

17      c.   **Plaintiffs Fail to Show the Vendors Acted Consistently With**
18           **Sperian's Direction.**

19      Since Plaintiffs have not advanced any evidence that the Vendors reasonably believed that

20  Sperian wanted them to place illegal calls, this element fails as a matter of law. *Bridgeview*—in

21  which the court found it "impossible to conclude that implied actual authority exists" when the only

22  evidence the plaintiff showed was that the defendant authorized fax marketing and not "sending

23

24  _____

[5] Lastly, Plaintiffs contend that "[r]ather than implement measures to prevent all the Vendors and
25  subcontractors from calling unapproved leads, Sperian contracted with new and different Vendors,
    who in turn engaged more downstream calling centers." (Opp., pp. 21-22.) This argument is
26  inconsistent with Plaintiffs' other arguments. Throughout their brief, Plaintiffs charge that Sperian
    should have terminated the Vendors on the first instance of non-compliance, and not rest on the
27  result of subsequent investigations or remedial action plans it implemented. Yet here, Plaintiffs
    chastise Sperian for using New Wave and Vestra to place calls instead of or in addition to the EGC
28  Parties and Baetyl. Moreover, the allegation is untrue. As indicated above, and in Sperian's opening
    brief, Sperian <u>did</u> implement measures to prevent repeated calls to unapproved leads.

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

these ads to states where the advertiser does not do business"—shows that proof of an agent's state of mind is necessary, and also that it is entirely possible to contract with an agent and for the agent to exceed the scope of its authority. 816 F.3d at 939; *see Salyers*, 871 F.3d at 940 ("Implied actual authority comes from a general statement of what the agent is supposed to do; an agent is said to have the implied authority to do acts *consistent with that direction*.") (emphasis added). Plaintiffs do not dispute that each Vendor represented and warranted that it would comply with all federal, state and local legal and regulatory requirements related to sales and marketing activities. (*See* Opp. at 19:2-14, citing Ex. B at ¶ 19.) Plaintiffs also do not dispute that Sperian required that the EGC Parties and Baetyl submit proposed call lists and only dial from returned approved lists. (*See* Opp. at 3:8-14, citing Ex. 3, 254:14-22.) Similarly, Plaintiffs do not dispute that Sperian only permitted New Wave and Vestra to conduct opt-in and warm transfer calls. (*See* Opp. at 8:7-8.) That the Vendors exceeded the scope of authority granted to them by Sperian does not, by itself, suggest that the Vendors reasonably believed the Sperian approved their acts. Thus, there is no competent evidence of the Vendors' belief as to Sperian's alleged acquiescence.

### B. Vendors Did Not Have Express Actual Authority "to Place the Unlawful Calls."

Plaintiffs assert they "do not allege express agency under an employer-employee theory." (Opp., p. 22.) Nevertheless, Plaintiffs argue throughout their Opposition, including in the context of their implied actual authority theory, that Sperian had the right to control the Vendors. Because control is a factor for actual authority, Sperian addresses the flaws in Plaintiffs' arguments here.

Importantly, though the ten-factor test in *Jones* is rooted in employer-employee agency law, its application extends beyond employer-employee cases. For instance, in *Armstrong v. Investor's Bus. Daily, Inc.*, No. 18-2134, 2020 WL 2041935, at *8 (C.D. Cal. Mar. 6, 2020)—another TCPA case—the plaintiff conceded he "is not pursuing actual authority under an employer-employee theory" and yet the court still considered *Jones*. On summary judgment, the court first analyzed whether defendant IBD had given a subvendor "actual authority to [send the messages] in violation of the TCPA," and concluded that IBD had not. *Id.* at *7 (brackets in original). The court then turned to the *Jones* test, which it dubbed the "'Manner and Means' Control Theory." *Id.* at *8. The court considered the ten *Jones* factors because "the extent of control exercised by the [principal] is the

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

1    essential ingredient" and a threshold question for application of vicarious liability. *Id.*; *see also N.L.*

2    *v. Credit One Bank, N.A.*, No. 17-01512, 2018 WL 5880796, at *4 (E.D. Cal. Nov. 8, 2018) (citing

3    *Jones*, 887 F.3d at 450-51) (same).

4             Plaintiffs do not bother to address any of the ten factors in the *Jones* test, and thus concede

5    Sperian's arguments. Instead, Plaintiffs attempt to argue that the trial courts' analyses in *Thomas* and

6    *Lushe* should apply in lieu of this Ninth Circuit authority. Yet even then, all Plaintiffs do is recite

7    that the *Thomas* and *Lushe* courts "refused to grant summary judgment on the plaintiffs' express

8    actual authority theory based on similar facts" and that the facts "supported a greater degree of

9    control over the manner and means of the campaign," before concluding that "[t]he same is true

10   here." (Opp., p. 23-24.) Plaintiffs do not bother to identify a single "similar fact" in the record in this

11   case or attempt to support their contention that regarding the comparative levels of control.

12            In any event, the facts were not as similar as Plaintiffs contend. In *Thomas*, the plaintiff "did

13   not present any evidence to the Court that Taco Bell directed or supervised the manner and means of

14   the text message campaign conducted by" the contractor and its two agents, "presented no

15   evidence… that Taco Bell created or developed the text message," and did not "present any

16   evidence… that Taco Bell played any role in the decision to distribute the message by way of a blast

17   text. All of this control over the manner and means of the text message campaign was exercised by

18   the [contractor and its agents], and [plaintiff] has not presented any evidence to the Court

19   demonstrating that Taco Bell controlled the actions of these entities with respect to the campaign."

20   *Thomas*, 879 F. Supp. 2d at 1085; *see also Thomas*, 582 F. App'x 678, 679 (9th Cir. 2014) (agreeing

21   with the district judge's analysis of the evidence). Here, Sperian provided talking points to ensure

22   the Vendors did not use deceptive practices during their calls, but Sperian did not control when and

23   how to place calls (other than to require that Vendors call only approved numbers) and did not

24   authorize Vendors to call numbers not on approved lists. (Ex. A, ¶¶ 3-7 and 17; Ex. B at § 3; Ex. C

25   at § 3; Ex. D at § 3; and Ex. E at § 3.) By contrast, in *Lushe*, the court found that the defendant

26   exercised a greater degree of control over the manner and means of the campaign than Taco Bell

27   because the defendant instructed its vendors on such means and "was aware that at least [one

28   vendor] was using an [ATDS]."   2014 WL 5794627, at *6. In addition, unlike this case, the

1   defendant in *Lushe* did not require the vendors to perform the contracts in accordance with

2   telemarketing laws. *Id.* And as discussed below, Plaintiffs have presented no evidence that Sperian

3   knew that any Vendor, much less a subcontractor of a Vendor, was using an ATDS.

4
5   **IV.   THE VENDORS DID NOT HAVE APPARENT AUTHORITY TO PLACE UNLAWFUL CALLS.**

6       **A.   Plaintiffs Do Not Show the Restatement Applies.**

7       Plaintiffs also fail to carry their burden with respect to apparent authority. First, Plaintiffs

8   deliberately mischaracterize Sperian's arguments to create the impression that Sperian is misstating

9   the law. Plaintiffs write that "Sperian asserts that to impose vicarious liability on an apparent

10  authority theory Plaintiffs must provide proof of 'direct communications' between Sperian and the

11  Plaintiffs." (Opp., p. 25.) Not true. In fact, Sperian specifically acknowledged "the principal's

12  manifestation need not be directly made to the third party." (Mot., p. 30.)

13      But this is the exception, not the norm. Plaintiffs' proposition is rooted in the language in the

14  Restatement (Third) of Agency, which states that "an indirect route of communication between a

15  principal and a third party may suffice, especially when it is consistent with practice in the relevant

16  industry." Restatement (Third) of Agency § 3.03, cmt. b. However, the example the Restatement

17  gives of such a situation demonstrates that while a manifestation by the principal directly to the third

18  party is not needed, there must be some kind of prior history or course of dealing between the parties

19  which would cause the third party to believe the principal has vested the agent with authority.

20      The Restatement situation is not analogous to this case, where Plaintiffs' only information

21  stems from the contents of the brief telemarketing calls at issue. Plaintiffs do not identify any recent

22  prior history between Plaintiffs and Sperian which would lead a reasonable person in Plaintiffs shoes

23  to believe that Sperian authorized the Vendors to call Plaintiffs. Nor do Plaintiffs state how any

24  indirect communication between Sperian and Plaintiffs was "consistent with practice in the relevant

25  industry." Plaintiffs do not even identify what industry practice was supposedly at issue.

26      **B.   The FCC's *Dish* Factors Are Not Met.**

27      The examples of evidence that might be relevant—but not dispositive—in finding apparent

28  authority, as provided by the FCC in *the Matter of the Joint Petition Filed by Dish Network, LLC, et*

123430505                                      17

1    *al.*, 28 F.C.C. Rcd. 6574 (2013), are of no further assistance.

2         The FCC's first example—"evidence that the seller allows the outside sales entity access to

3    information and systems that normally would be within the seller's exclusive control, including:

4    access to detailed information regarding the nature and pricing of the seller's products and services

5    or to the seller's customer information"—is not implicated. *Id.* at 6592 ¶ 46. Plaintiffs incorrectly

6    contend that "Sperian provided the Vendors and subcontractors credentials that allowed them to

7    access a 'portal' where they could review all sales activity…"  (Opp., p. 25.) Plaintiffs only reach

8    this conclusion by misreading Mr. Moya's testimony. Mr. Moya explained that the portal is operated

9    and controlled by TPV, not Sperian. (Ex. 2, 161:7-162:10.) Sperian does not control the portal. (*See*

10   Ex. A, ¶ 13; Ex. 2, 161:7-162:13.) Moreover, the TPV portal only allows Vendors to view

11   summaries of the sales performance of their own agents—information which the Vendors used to

12   monitor valid sales. ((Ex. 2, 161:7-162:10.) Vendors could not use the TPV portal to access of

13   Sperian's proprietary customer information. (*See* Ex. A, ¶ 13; Ex. 2, 161:7-162:10.) Plaintiffs also

14   cite Sperian's motion and contend that "Sperian admit[ted] Sperian provided [Vendors] with

15   information regarding the nature and pricing of its products." (Opp., p. 25.) However, the full

16   sentence shows that Sperian limited Vendors' ability to use this information in conversations with

17   prospects: "[W]hile the vendors do give pricing and price protection information to consumers, they

18   are prohibited from quoting any savings a potential customer may earn by purchasing energy on the

19   open market from an electric generation suppliers ('EGS') like Sperian." (Mot., p. 31.)

20        The FCC's second example—"[t]he ability by the outside sales entity to enter consumer

21   information into the seller's sales or customer systems"—is not present. *Dish*, 28 F.C.C. Rcd. at

22   6592 ¶ 46. Plaintiffs concede "agents could not directly enter customer information…." (Opp., p.

23   25.) Moreover, Vendors did not have the ability to actual enroll a customer into new energy services:

24   Vendors were required to transfer the call to TPV to verify the customer wished to enroll with

25   Sperian. (Ex. A, ¶¶ 3-6 and 18; Ex. B at § 3; Ex. C at § 3; Ex. D at § 3; and Ex. E at § 3.) And TPV,

26   likewise, lacked the ability to enroll customers. (Ex. A, ¶ 18.) TPV would validate the sale and

27   Sperian was the only party with the actual ability to send a verified sale to the utility company for

28   enrollment. (Ex. A, ¶¶ 3-6 and 18; Ex. B at § 3; Ex. C at § 3; Ex. D at § 3; and Ex. E at § 3.)

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

The FCC also states that whether "the seller approved, wrote or reviewed the outside entity's telemarketing scripts" may be persuasive. *Dish*, 28 F.C.C. Rcd. at 6592 ¶ 46. Plaintiffs assert that "Sperian provided Vendors with pre-approved scripts that calling centers were required to use." (Opp., p. 25.) This is irrelevant to the type of TCPA claims at issue. That Sperian provided general scripts or talking points to Vendors to curb deceptive trade practices has nothing to do with the manner and means of the calls—*i.e.*, that Sperian caused reasonable third persons to believe that Sperian authorized calls to persons not on approved lists using an autodialer, or in ignorance of a do-not-call request. In other words, the content of the calls are not at issue. What is more, the Vendors did not even follow the scripts—failing to identify Sperian on the calls, as acknowledged by Plaintiffs themselves. (Ex. 69, ¶¶ 8-9.)

Finally, the FCC states that it may be persuasive "if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct." *Dish*, 28 F.C.C. Rcd. 6574, 6592 ¶ 46. Plaintiffs contend that "Sperian was well aware the each of the Vendors had made illegal calls but failed to take prompt disciplinary action." (Opp., p. 25.) But the FCC's example does not require "prompt disciplinary action;" instead, "effective steps … to force the telemarketer to cease that conduct" are enough. As discussed above, Sperian conducted investigations, issued letters pursuant to those investigations, and demanded and received assurances from the EGC Parties that the EGC Parties were in "full control" and had remedied their errors.

Plaintiffs contend that all five factors need not be present for there to be a finding of apparent authority. (Opp., p. 25.) Plaintiffs cite just one out-of-circuit district court case, *Mey v. Venture Data*, 245 F. Supp. 3d 771, 789 (N.D. W. Va. 2017), for this proposition. (*Id.*) No court within the Ninth Circuit has cited to *Mey* in the context of an apparent authority argument.

## C.   Plaintiffs' Analysis Is Incomplete: They Fail to Discuss How They Relied on Any Manifestations by Sperian.

Plaintiffs must also show how they relied on the apparent authority. "Apparent authority … can only 'be established by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied.'" *Thomas*, 582 F. App'x at 679 (quoting *NLRB v. Dist. Council of Iron*

1  *Workers of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir.1997), and citing Restatement (Second) of

2  Agency § 265 cmt. a (1958)). In *Thomas*, for example, the plaintiff did not show "that she

3  reasonably relied, much less to her detriment, on any apparent authority with which Taco Bell Corp.

4  allegedly cloaked the Chicago Association, ESW, or Ipsh." 582 F. App'x at 679-80. Accordingly,

5  there was no triable issue as to apparent authority. *Id.* Here, Plaintiffs do not explain how they,

6  personally, relied on any of Sperian's supposed "manifestations," especially when Sperian was not

7  mentioned by name on the front-end of the calls.

8  **V.    THERE IS NO EVIDENCE TO SUGGEST SPERIAN RATIFIED UNLAWFUL**

9  **CONDUCT.**

10  Plaintiffs advance two bases for Sperian's supposed ratification of acts. First, that Sperian

11  knowingly accepted the benefits of their actions; and second, that Sperian willfully ignored unlawful

12  acts. (Opp., pp. 26-27.) As explained below, both points fail.

13  **A.    Plaintiffs Fail to Show That Sperian Knowingly Accepted a Benefit from the**

14  **Vendors' Alleged Unlawful Calls.**

15  **1.    Plaintiffs Do Not Identify the "Benefit" Sperian Supposedly Accepted.**

16  It is undisputed that Sperian did not benefit from calls to Plaintiffs, as Plaintiffs fail to show

17  that Sperian received any monies from calls to the Plaintiffs or any illegal calls.[6] The fact that

18  Sperian compensated its vendors for legal, TCPA-compliant calls is irrelevant because there is no

19  evidence to suggest Sperian paid any of its Vendors for illegal calls. Plaintiffs do not dispute that

20  Vendors were paid by completed sale, rather than by attempted sale or by call. (*See* Opp. at 9:16-17

21  citing Ex. B, ¶ 17 ("Sperian also required the Vendors to complete valid third-party verification for

22  sale 'in order to be considered for compensation.'").) Plaintiffs also do not dispute that Sperian

23  could, and did, claw back payments to Vendors which did not comply with Sperian's policies. (*See*

24  Opp. at 10:3-4 citing Ex. C at ¶ 7, Ex. D at ¶ 7, ex. E at ¶ 7.) Plaintiffs do not identify a single

25  instance where Sperian failed to claw back a sale that did not comply with Sperian's policies. (*See*

26

27

28  ---
[6] Plaintiffs' speculation about how much Sperian may have "realized" as monthly revenue based on "cost savings examples" is not probative of any actual sales revenue realized from illegal calls, as no such evidence exists in the record. (*See* Opp. 15:18-16:14.)

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

Opp.) And of course, Plaintiffs never became customers of Sperian. (Ex. A, ¶ 29; *see* Opp. at 7:1-6.).

Plaintiffs argue that in *Aranda*, the district court in Illinois "[r]ejected an identical argument, finding that an issue of fact existed when, even though the named plaintiffs did not purchase anything, the evidence showed the defendants were aware of unlawful telemarketing calls but 'continued to accept business flowing' from those calls." (Opp., p. 30.) The facts in *Aranda* are not "identical." In *Aranda*, the lead generator was compensated "for every call that was transferred to a CCL representative and lasted more than thirty seconds beyond the transfer." 179 F. Supp. 3d at 821. In other words, the lead generator was incentivized to call as many people as possible. In contrast, (1) Sperian only paid for calls which resulted in actual sales, (2) proposed sales had to be verified by a third party, and (3) Sperian audited sales and clawed back payments when it identified as "bad sale." (Ex. A, ¶¶ 15, 21; Ex. C at ¶ 7, Ex. D at ¶ 7, ex. E at ¶ 7.) Sperian incentivized Vendors to make real sales to real persons who would actually consider Sperian's services, not to place unlawful or unwanted calls *en masse*.

### 2. The Evidence Cited by Plaintiffs Does Not Support Their Contention That Sperian Knowingly Allowed Unlawful Calls by Vendors.

Plaintiffs also fail to show that Sperian knowingly accepted unlawful calls. First, Plaintiffs incorrectly contend that "Sperian received multiple complaints of illegal calls associated with each Vendor" and that "[d]espite these complaints, Sperian disregarded the callers' practices and did nothing to make sure the TCPA violations stopped." (Opp., p. 28.) Again, with respect to the EGC Parties, Plaintiffs conveniently ignore undisputed facts: Sperian conducted an investigation, sent a warning letter, demanded and received the EGC Parties' assurances that they had taken "full control" and would take corrective action, and ultimately terminated the EGC Parties.[7]  (Ex. A at ¶ 20, Ex. L and Ex. AF.) Further, it is undisputed that Sperian required New Wave and Vestra to undergo a trial for outbound calls and, when Sperian identified non-compliant practices, Sperian restricted New Wave and Vestra to opt-in and warm transfer calls, only. (Ex. A, ¶¶ 10-12 and Ex.

---

[7] Contrary to Plaintiffs' assertion (*see* Plaintiffs' Opp. p. 12:12-14 (citing Ex. 40 and ECF 1)), Sperian suspended the EGC Parties and their agents on January 17, 2019, four days before Mr. Perrong filed suit. (Ex. 40.)

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

1  G.) When Sperian discovered later alleged violations by New Wave and Vestra, it promptly

2  terminated New Wave and Vestra. (Ex. A, ¶¶ 5-6.) Finally, the alleged calls by Baetyl to Mr. Shelton

3  were the first issues of non-compliance; Plaintiffs fail to identify any prior issues of non-compliance

4  by Baetyl which Sperian failed to timely address. (*See* Opp. at 12:16-22 citing Exs. 41 and 42.)

5      Plaintiffs misleadingly assert that "Sperian rewarded the Vendors with increased

6  commissions and incentive bonuses" for unlawful calls. (Opp., p. 28.) The record demonstrates that

7  the referenced amendments to the EGC Parties and Baetyl contracts relating to higher commissions

8  stemmed from changes in the product being sold—specifically, longer term energy contracts being

9  offered by Sperian—and not from any Vendor's performance. (Ex. 2, 300:8-18.) In October 2019,

10  well after Plaintiffs initiated this lawsuit, Sperian increased the length of the terms of the contracts it

11  offered to customers. (Ex. 2, 300:3-18.) Accordingly, Sperian changed the commissions it paid the

12  Vendors for completed sales: longer customer contracts corresponded with larger commissions. (*Id.*)

13      Plaintiffs suggest that "Sperian knew autodialers were used." (Opp., p. 28.) As evidence,

14  Plaintiffs claim that "Sperian even sent EGC a questionnaire that included specific questions about

15  what type of 'dialer' EGC used, whether or not it was a predictive dialer, and how many calling

16  centers it had." (*Id.*) But, the questionnaire is outside the relevant time period.[8] Nor do Plaintiffs

17  present any evidence that Sperian sent similar questionnaires to the other Vendors, or that the other

18  Vendors' completed the questionnaires. Moreover, neither of Plaintiffs' cited evidence—that Mr.

19  Moya rarely visited calling centers (*See* Opp. p. 8:19-20.), or an email indicating TIEG's use of a

20  "dialer"—creates a triable issue as to Sperian's knowledge that an "autodialer" was used. What is

21  more, the allegations are irrelevant. The use of an ATDS is only illegal when calling a cellular

22  telephone without prior express consent, 47 U.S.C. § 227(b)(1)(A)(iii), or when twice calling a

23  residential telephone number that has been on the National DNC Registry for more than 31 days

24

25  ―――――――――――――
[8] A prior leadership team at Sperian sent the questionnaire, along with a blank contract, to the EGC

26  Parties on April 20, 2016. (Ex. 32.) This did not result in a relationship with Sperian at that time.
(Declaration of Edgar Moya (attached to Sperian's Supplemental Appendix as **Exhibit AJ**), ¶¶ 5-6.)

27  Sperian did not contract with the EGC Parties until August 28, 2017, after the Sperian employee who
had sent the questionnaire left the company. (Ex. B; Ex. 32; and Ex. AJ, ¶¶ 5-6.) Plaintiffs present no

28  evidence that Sperian considered the EGC Parties' 16-month old responses in deciding to contract
with the EGC Parties in 2017.

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

prior to the call, 47 U.S.C. § 227(c)(5). Here, Sperian (1) scrubbed proposed outbound calls lists submitted by the EGC Parties and Baetyl and (2) restricted New Wave and Vestra to opt-in and warm transfer calls only, such that the use of an ATDS would not have been an issue had the Vendors complied with Sperian's policies.[9] (Ex. A, ¶¶ 8, 10, 11 and 12; Ex. G.)

Finally, Plaintiffs complain that "[w]hile Sperian eventually fired EGC and Baetyl in response to Plaintiffs' complaints, their termination did not end the calls…   After Plaintiffs sued, they continued to receive calls." (Opp. p. 28.) This is misleading. Plaintiffs contend these later calls were placed by different Vendors—New Wave and Vestra.

**B.      Plaintiffs Fail to Show That Sperian Was Willfully Ignorant of Unlawful Conduct by the Vendors.**

Plaintiffs fail to identify a single genuine issue of fact which shows that Sperian willfully ignored unlawful conduct. First, Plaintiffs charge that "at a minimum, the complaints Sperian received, combined with its knowledge about fraudulent industry practices, should have alerted Sperian that it needed to investigate further. Instead, … Sperian continued to accept the benefits of the calling centers' violations and remained silent about their legal obligations under the TCPA." (Opp., p. 29.) As discussed above, the evidence Plaintiffs advance for the notion that Sperian "remained silent" is contrived, and the conclusion is reached only by ignoring genuine undisputed facts, including: that Sperian promptly investigated issues of non-compliance, sent warning letter, and received assurances of corrective action. Moreover, Plaintiffs do not present any evidence that Sperian had "knowledge of industry practices," or even what the supposed industry practices were.

Plaintiffs misleadingly write that "Sperian admits that it did 'not attempt to control, direct, or supervise' the call centers…." (Opp., p. 29.) Plaintiffs deliberately chopped this quote to create the impression that Sperian knowingly turned a blind eye to potential unlawful calls. In fact, Sperian wrote in its Motion that "[w]ith certain exceptions, like the aforementioned instructions to the EGC Parties and Baetyl to only call numbers on approved lead lists, Sperian agreed to 'respect Vendor's

---

[9] Similarly, Plaintiffs' reference to Sperian's onboarding materials and caller compliance guidelines with respect to consumer consent for outgoing calls (*see* Opp. 7:19-8:22) are of no moment—the lists were scrubbed to ensure compliance. Therefore, Plaintiffs' "failure to train" theory fails to create a triable issue for vicarious liability.

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**

autonomy and … not attempt to control, direct, or supervise Vendor's (or its Vendors) activities in any manner.'"   (Mot., p. 11.) Rather than admit the lack of policies, Mr. Moya testified that Sperian's agreements contained "rules that the vendor must follow," including that Vendors must comply with all telemarketing laws. (Ex. 2, 305:24-205:8.) Moreover, under Plaintiffs' theory, if Sperian had controlled, directed, or supervised the Vendors in the way that Plaintiffs contend it should have, then Plaintiffs would have argued vicarious liability through control.

Finally, Plaintiffs are correct that a principal can create an agency relationship where none existed before—here, as between Sperian and the Vendors' subcontractors—if the principal ratifies the subcontractors' acts. But Plaintiffs omit two critical facts from *Henderson*,[10] the only case cited by Plaintiffs for this proposition. First, in *Henderson*, "[w]ithout needing USA Funds' approval, the collectors negotiated, deferred, and took payments on USA Funds' behalf." 918 F.3d at 1074. Here, it is undisputed that no Vendor or subcontractor could accept a payment (a benefit) for Sperian. Instead, each sale was contingent upon Sperian's approval through submission to the utility. And, unlike in *Henderson*, where the principal rubber-stamped the actions of the debt collectors, payment by Sperian to a Vendor (acceptance of the benefit) was subject to Sperian's final review and approval. (Ex. B at § 2; Ex. C at § 2; Ex. D at § 2; Ex. E at § 2.) Second, even though the principal in *Henderson* did not contract directly with the debt collectors, the principal knew about the debt collectors and was "aware that debt collectors handling USA Funds' loans had been sued regarding their calling practices." 918 F.3d at 1071. Here, there is no evidence that the subcontractors had been previously sued, and it is undisputed that Sperian did not know the identity of the subcontractors who called Plaintiffs. (*See* Opp. at 7:17-18; and Ex. A, ¶ 16.)

## VI.   CONCLUSION.

For the foregoing reasons and the reasons set forth in the Motion, Sperian respectfully requests that the Court grant the Motion and enter summary judgment in favor of Sperian.

---

[10] Plaintiffs make no attempt to distinguish *Kristensen v. Credit Payment Servs., Inc.*, 879 F.3d 1010 (9th Cir. 2018), other than to say it "has no relevance here" because it predates *Henderson*. But, in *Henderson*, the Ninth Circuit did not overrule *Kristensen*; it merely distinguished it from the facts that were before the court. However, *Henderson* only helps Plaintiffs when they omit critical facts.

1

DATED:  June 22, 2020

2

3

By: _____

4
                    BLANK ROME LLP
                    Ana Tagvoryan (admitted *pro hac vice*)

5
                    atagvoryan@blankrome.com
                    Harrison Brown (admitted *pro hac vice*)

6
                    hbrown@blankrome.com
                    Dustin Moaven (pending admission *pro hac vice*)

7
                    dmoaven@blankrome.com
                    2029 Century Park East | 6th Floor

8
                    Los Angeles, CA 90067
                    Telephone:424.239.3400

9
                    Facsimile: 424.239.3434

10
                    KRAVITZ, SCHNITZER & JOHNSON, CHTD.
                    Gary Schnitzer (Nevada Bar No. 395)

11
                    gschnitzer@ksjattorneys.com
                    8985 S. Eastern Avenue, Suite 200

12
                    Las Vegas, Nevada 89123
                    Telephone:702.362.6666

13
                    Facsimile: 702.362.2203

14
               Attorneys for

15
               TOMORROW ENERGY CORP.
               fka SPERIAN ENERGY CORP.

16

17

18

19

20

21

22

23

24

25

26

27

28

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY SPERIAN ENERGY CORP.**