UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| ANDREW PERRONG and JAMES EVERETT SHELTON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SPERIAN ENERGY CORP., a Nevada corporation, ENERGY GROUP CONSULTANTS, INC., a Kansas Corporation, and BAETYL GROUP LLC, a Texas limited liability company,<br><br>Defendants. | Case No. 2:19-cv-00115-RFB-EJY<br><br>**ORDER** |
| TOMORROW ENERGY CORP fka SPERIAN ENERGY CORP., a Nevada corporation,<br><br>Cross-Claimant and Third-Party Plaintiff,<br><br>v.<br><br>BAETYL GROUP LLC, a Texas limited liability company,<br><br>Cross-Defendant<br><br>KEVIN SANGUDI, an individual,<br><br>Third-Party Defendant.<br><br>Related cross-complaints and third-party complaints. | |

Before the Court is Plaintiffs' Motion for an Order to Show Cause and for Sanctions Against EGC (the "Motion"). ECF No. 164. The Court has considered Plaintiffs' Motion, Defendant Energy Group Consultants, Inc.'s Response (ECF No. 168), and Plaintiffs' Reply (ECF No. 170). The Court finds as follows.

## I. THE FACTS.

### A. Background Facts Leading To The Motion Pending Before The Court.

Plaintiffs' Motion stems from the commencement of this case and the issue of whether and when Energy Group Consultants ("EGC") took appropriate steps to ensure the preservations of records that were obviously going to be relevant in this Telephone Consumer Protection Act ("TCPA") matter. The most relevant history is recounted here.

On November 8, 2019, approximately ten months after this case began, the Court held an hour long hearing with counsel for the parties to discuss numerous outstanding discovery issues. At the conclusion of the hearing, the Court ordered, *inter alia*:

> EGC … shall produce any and all records, [in] their possession, custody, or control, pertaining to any calls made … to either Plaintiff.
>
> IT IS FURTHER ORDERED that to the extent that EGC has the ability to assist in obtaining records pertaining to Mr. Perrong and Mr. Shelton from any of its sub-contractors, that effort shall be made promptly by EGC and those records shall be produced by such subcontractors to EGC, who will then produce the records to all parties in this dispute. EGC is authorized to alert its subcontractors that failure to produce records in their possession, custody or control regarding Plaintiffs may result in an order to show cause why the subcontractor should not be held in contempt.
>
> IT IS FURTHER ORDERED that EGC … shall document its efforts to gather records regarding Plaintiffs and provide such documentation to Plaintiffs' counsel.
>
> IT IS FURTHER ORDERED that EGC, shall produce call records, without names, for the period commencing with four years before the filing of the complaint up to one week prior to production. This Order also includes production of EGC and Baetyl downlines.

ECF No. 104.

On December 10, 2019, the Court held a follow up hearing on the issues discussed in November. At the conclusion of that hearing, the Court ordered, *inter alia*:

> EGC shall, no later than **5:00 p.m. PST on December 20, 2019**, produce to Plaintiffs, … call records for which EGC previously promised to search. EGC shall explain, in writing, how it searched for additional responsive documents, and what, if anything, was located.
>
> [I]f EGC is unable to produce call records by **5 p.m. PST on December 20, 2019**, it shall provide to Plaintiffs, … a written explanation … why EGC is unable to do so and a date certain that is at least seven (7) days before the inspection for production of such call records.

ECF No. 106.

On December 27, 2019, Plaintiffs filed an Emergency Motion seeking sanctions against EGC (the "Emergency Motion"). ECF No. 113. The Emergency Motion was based, in part, on Plaintiffs' contention that EGC failed to preserve call records in accordance with its obligations under the Federal Rules of Civil Procedure. As noted in Plaintiffs' Emergency Motion, Plaintiffs' First Set of Interrogatories and First Set of Document Requests sought identification of the system, equipment or platform used to make calls at issue, as well as the production of call records relevant to their claims. *Id*. at 5. EGC responded to Plaintiffs' discovery requests stating, in sum, that "EGC uses VICI to place telemarketing calls. The system is continually updated by VICI. It is Version 2.14-621a, build 170717-1444, 2017." *Id*. EGC added to this response only that discovery was ongoing thereby reserving EGC's right to supplement its responses. *Id*. at 6. No call records were produced. No information pertaining to the location of the call records was produced. No identification of third parties in possession of call records was provided. No information regarding the company hosting telephone calls made by the VICI dialer identified by EGC in its interrogatory responses was provided. *See* EFC Nos. *Id*. at 7; 113-6; 113-7 at 3.

As discussed in Plaintiffs' Emergency Motion and consistent with the identification of the "dialer" EGC stated it used to place telemarketing calls, the then-counsel for EGC told Plaintiffs that EGC had calling records that would be produced. ECF No. 113 at 6 citing Declaration of Anthony Paraonich ¶ 8. However, just before withdrawing from representation of EGC, that same counsel revised his representation telling Plaintiffs that it appeared EGC did not have calling records applicable to this case; noting instead that such records belong its "downstream vendor Team Integrity," the entity EGC later described as "the telemarketing arm of EGC." *Id*. at 6 (citing Declaration of Anthony Paraonich ¶¶ 9-10); ECF No. 170 at 15.[1] Months later, on December 4, 2019, EGC further revised its representations telling Plaintiffs that "our dialer" was really a reference to team Integrity's dialer. ECF No. 113-7 at 3.

---

[1] Plaintiffs attempted to subpoena records from Team Integrity, then based in Florida, but some flaw in the initial process resulted in no records being produced. *See* ECF No. 105 at 8 and 19. In any event, what is clear is that no call records were ever produced by Team Integrity to EGC despite EGC's admission that Team Integrity was its telemarketing arm. ECF Nos. 122 and 170 at 16-17.

On January 9, 2020, the Court held a hearing on Plaintiffs' Emergency Motion and issued a written Order on January 17, 2020. ECF No. 125. The Court's written order granted Plaintiffs' request for an award of fees and costs, and confirmed the Court's ruling made on January 9 that denied Plaintiffs' request for an adverse inference instruction against EGC. The Court sought more information regarding the relationship between EGC and Team Integrity based on the representation that the calling records belonged to Team Integrity.

In response to the request for additional information, EGC explained that Team Integrity provided "call center services to EGC" and, that in February 2019, EGC supposedly took some steps to ensure Team Integrity saved "all data and information relative to" Plaintiffs' claims. ECF No. 125 quoting portions of ECF No. 122 (the Supplement Declaration of Adam R. Knecht, counsel for EGC). EGC contended that it had produced to Plaintiffs all documents and data received from Team Integrity, and Team Integrity's subcontractor G-Energy, that Team Integrity made no calls to Plaintiff Perrong, but that according to a principal of Team Integrity, it was G-Energy that made such calls. *Id*. EGC affirmatively stated it never had call records of its own, that all such records were "available from Team Integrity and Team Integrity's downstream contractor G-Energy," and that all available records had been produced. *Id*. at 3.[2] Importantly, at the time of the Court's January 25, 2020 Order no call records had been produced to Plaintiffs.

Further, and in contrast to the declaration regarding the production of all available records from Team Integrity, EGC told Plaintiffs through a December 4, 2019 email exchange between Plaintiffs and EGC (submitted by Plaintiffs in support of their December 27, 2019 Emergency Motion) that the call records Plaintiffs sought were actually stored on some unidentified computer server located in India. Specifically, after EGC blamed its downline vendors (including Team Integrity) for the failure to produce calling records, EGC stated:

> We contacted Team Integrity about call records and received the following explanation: Team Integrity is utilizing a server in India that does not keep records longer than 30 or 90 days, depending on whether a sale is made.

---

[2] The declaration submitted by EGC also confirmed it had an unwritten "contractual" relationship with Team Integrity, described Team Integrity as an independent contractor, and stated that in February 2019 "EGC informed Team Integrity to save, preserve, and provide EGC with all data" relevant to Plaintiffs' claims. ECF No. 122.

4

> EGC has really done all they can from their end.  EGC does not have any control or involvement with the India dialer.

*Id*. at 3.  EGC also stated that it was on January 13, 2020 (approximately a year after the litigation started) that counsel for EGC first spoke with an individual named Tyde Bonaparte ("Bonaparte"), a principal of Team Integrity, who told him all documents Team Integrity had were previously provided.  ECF No. 122.

Despite the apparent knowledge held by Team Integrity regarding some alleged server in India and its relationship to EGC as its strategic partner acting as its telemarketing arm (ECF No. 179 at 14-17), there was no evidence of any kind presented to Plaintiffs or the Court that EGC had made any attempt whatsoever to identify the entity to whom the alleged server in India belonged or, at any time, to obtain call records from the company hosting the server.  ECF No. 125 at 3.  EGC also appeared to have made no attempt to identify the company that would have hosted or supported the calls made on the VICI dialer EGC disclosed in its interrogatory responses.  *Id*.  The Court found not only that EGC had not done all it could, as EGC claimed, but instead what seemed to be occurring was a deepening mystery regarding who was responsible for preserving call records over which no entity seemed to claim control.  *Id*.

After analyzing the duty to preserve relevant evidence, the Court concluded whether records had been spoliated was unclear because no defendant admits ever having call records.  *Id*. at 4.  The Court noted that the revelation regarding the server in India had yet to be explored because EGC made no attempt to gather additional information regarding what, if any, records remained available.  *Id*.  The Court found that EGC provided "absolutely nothing that evidences any efforts were made … to ensure calling records were retained or to otherwise discover where or how Team Integrity may have maintained such records until the Court entered its Order on November 8, 2019."  *Id*.

The Court then walked through the facts showing that each defendant and their subcontractors pointed the finger at some other entity as the entity with control over calling records.  And, in a word, the Court found this "unacceptable."  *Id*.  The Court stated: "The Defendants cannot be permitted to simply point fingers at one another each saying it does not have calling records, when calling records are at the heart of this case."  *Id*. at 5.  Nevertheless, because it was unclear

5

that spoliation had occurred, the Court did not grant spoliation sanctions, but instead ordered, among other sanctions later vacated, that EGC was to pay the Plaintiffs' attorney's fees and costs incurred in bringing the Emergency Motion. *Id*. at 7-8.

On January 30, 2020, Plaintiffs filed a memorandum regarding their attorney's fees and costs to which EGC responded. ECF Nos. 127 and 129. On June 4, 2020, the Court entered an Order awarding Plaintiffs $19,737.44 in fees and costs. ECF No. 154.[3] On July 24, 2020, Plaintiffs filed their instant Motion seeking an order to show case and sanctions against EGC. ECF No. 164.

B.     The Pending Motion For Order To Show Cause And For Sanctions.

After briefly summarizing the facts discussed above, Plaintiffs state that as of July 24, 2020, EGC had not complied with the Court's Order to pay Plaintiffs' fees and costs associated with their December 27, 2019 Emergency Motion. ECF No. 164 at 5. Plaintiffs' Motion also details the server and laptop inspection that occurred at EGC headquarters in early January 2020, the history of exchanges between Plaintiffs and EGC regarding call records, the location of the alleged server in India, and the identification of the telecommunication company that hosted calls made by or on behalf of EGC.

Plaintiffs attached a copy of their expert's report (ECF No. 164-1) arising from the attempt to inspect the EGC server and two Team Integrity laptops the Court previously ordered be available. The report explains, in more detail than recounted here, that after many attempts to do so, the expert could not access the EGC server, one of the two laptops to be imaged was not provided, and only six of 41 EGC email accounts were subject to search. *Id*. No call records or evidence of call records was found. Further, when the second laptop was forwarded to Plaintiffs' expert (Tyde Bonaparte's laptop, the Team Integrity principal mentioned above), it was non-functional. ECF No. 164 at 5.

---

[3] Between January 30, 2020 and June 4, 2020, EGC filed a Motion for Reconsideration of the Court's January 17, 2020 Order. On May 27, 2020, the Court issued an Order providing a detailed history of the discovery disputes in this case, modifying its January 17th Order, but also identifying numerous occasions when EGC either failed to comply with Court orders or belatedly did so. ECF No. 153 at 4-10. The Court reiterated a finding made on January 17, 2020, in which the Court stated that "EGC's clear lack of attention to the issue of call records, which has been the subject of several arguments before the Court and subsequent Court orders, the Court finds that EGC has not acted in good faith." *Id*. at 10 n.3 citing ECF No. 125 at 6-7; *see also* ECF No. 126 at 19-10, 27-28 (Transcript of the January 9, 2020 hearing in which counsel for EGC indicated he still needed to find out, almost a year after litigation began, and four months after becoming EGC counsel, whether EGC or Team Integrity had access to call records and whether Team Integrity had a dialer.). The Court ultimately granted EGC's Motion for Reconsideration in part by removing EGC's requirement that it pay the costs for the inspection of EGC's server and laptops belonging to Team Integrity. ECF No. 153 at 21.

Thus, if the computers to be inspected ever contained any evidence of call records, those records were no longer accessible.

Regarding the history of exchanges and EGC's efforts, if any, to preserve calling records, Plaintiffs point the Court to portions of the deposition of EGC's Fed. R. Civ. P. 30(b)(6) deponent Rob Morris ("Morris") attached to Plaintiffs Motion and Reply. Relevant testimony offered by Morris, as EGC's person most knowledgeable, included: (1) identification of a February 12, 2019 email, Morris admitted he never saw, sent by EGC employee Andrea Janoush ("Janoush") to Bonaparte at Team Integrity stating in toto with respect to preservation of documents, "Please make sure all data from this campaign is saved";[4] (2) Morris' attempt to obtain records of a single phone call pertinent to this dispute; (3) the admission that no efforts to obtain calling records were made after the Court's November 7, 2019 Order; (4) the admission that Team Integrity, previously described as an independent contractor, was really an entity with which EGC had a "close relationship" as a "strategic partner … [because t]hey were call center experts in" EGC's eyes; and, (5) that while Team Integrity is not a "division" of EGC, it was "the telemarketing arm of EGC … ." ECF Nos. 164-1 and 170 at 13-17. In his February 2020 deposition, Morris also first stated that there would be no phone lines associated with calls made and, thus, no records of such calls because the calls were cloud based, but when presented with the prior EGC disclosure that a VICI dialer was used, Morris stated (now more than a year after this litigation started) that he would be willing to ask Team Integrity about that dialer. ECF No. 164-1 at 23-25. Morris confirmed that its strategic partner, Team Integrity, ran a calling center until a couple of months prior to his deposition. ECF No. 170 at 17-18.

Also on the topic of preservation of records, Plaintiffs provide evidence that it was not until February 28, 2020, that EGC served a supplemental disclosure that included preservation or records letters to additional downline vendors dated February 18, 2020. ECF No. 164 at 6.

Compounding EGC's failures to ensure the preservation of evidence, on February 19, 2020, EGC produced a supposed invoice for the Team Integrity dialer service that supposedly had the call

---

[4] ECF No. 128-1 at 2. This email was reviewed by the Court in its May 27, 2020 Order. ECF No. 153 at 18.

records first ordered produced four months prior. ECF Nos. 104 and 164-1 at 46. However, to say this information was inaccurate would be a kind description of what occurred.

The invoice was from a company appeared to be known as Perfect 10. ECF No. 164-1 at 46. Plaintiffs issued a subpoena to Perfect 10 on the day after receiving the invoice, but Perfect 10 responded stating "that no activity existed for the [Team Integrity] account 'because the formal process of establishing this customer was not completed.'" ECF No. 164 at 7 *citing* the Affidavit of Charles D. Davidson, Jr. at ECF No. 164-1 at 60-61. When Plaintiffs notified EGC of this issue, EGC promised to look into the situation, but a month passed with no follow up from EGC. ECF No. 164 at 7. When Plaintiffs followed up with an email to EGC, EGC responded by blaming Plaintiffs for supposedly subpoenaing the "wrong 'Perfect 10,'" and then provided information for an individual in India named Ganesh Patel who apparently ran a company named Uconnect. ECF No. 164-1 at 71. Plaintiffs contacted Mr. Patel at the email address provided by EGC, and was advised that "we are confused related to [S]perian energy [calling] records because in our dialer not a single center dialed for [S]perian energy in the past." ECF No. 164-1 at 80. Mr. Patel then pointed out that Team Integrity did not start service with Mr. Patel's company until March 2019 for a business to business project. *Id*. March 2019 was two months after this litigation started and certainly after the majority of calls at issue for which records were sought by Plaintiffs ended.

When Plaintiffs followed up with EGC, the response was "What is the problem? … Ganesh is confirming that he never dialed for the Sperian campaign. Am I missing something here?" ECF No. 164-1 at 84. When Plaintiffs explained the problem was that EGC and its contractor (and strategic partner) needed to identify who did the dialing and has the calling records, it received no response from EGC. *Id*.

C.      EGC's Response to Plaintiffs' Motion.

EGC's response to the above undisputed facts is that "EGC and counsel have gone above and beyond the duty required to preserve evidence, reaching out to non-parties very early in the process and even filing claims against the party believed to be responsible (G-Energy)." ECF No. 168 at 2. EGC then states that it is a "door-to-door sales organization," that COVID-19 has resulted in "virtually no revenue" for the company, and that EGC "pleads with the court that it be allowed a

very generous timeframe to pay Plaintiffs' costs relative to the inspection that was performed earlier this year." *Id*. at 2-3.  However, as explained above, the Court granted EGC's Motion for Reconsideration with respect to inspection costs.  The Court nevertheless ordered EGC pay Plaintiffs' attorney's fees of $19,737.44.  ECF No. 153 at 21.

EGC next argues it has not spoliated any evidence because EGC again professed to have gone "above and beyond … to provide all parties in this litigation with everything EGC **AND**, presumably even non-party Team Integrity, has with respect to this litigation." ECF No. 168 at 4 (emphasis in original).  EGC states it does not have a dialer and, more importantly, it does not have "possession *or control*" over dialer files.  *Id*. at 5 (emphasis added).  EGC claims "exemplary due diligence" having "produced over 8,000 emails, documents, call lists, and other files to Plaintiffs." *Id*.  EGC points to a March 29, 2019 letter it sent to G-Energy (a subcontractor, aka downline provider, to Team Integrity), against whom EGC brought a third party complaint and who has been defaulted, saying "it was G-Energy that placed the calls at issue." *Id*. at 5-6.  EGC points to the email sent by its employee Janoush to Team Integrity in February 2019 and the follow up it did 10 months later in December 2019, after the Court's Order to produce call records.  *Id*. at 6.

EGC says nothing about its prior representations, confirmed in an email from its vice president, that it did have a dialer (known as a VICI dialer) or that the February 2019 communication to Team Integrity was a single sentence to preserve all "data" for which no follow up was done until after the Court's November 2019 Order.  EGC says nothing about the December 2019 discovery of an alleged server in India (that in any event was said by EGC not to save information for more than 30 or 90 days); nor does it mention that it made no efforts to follow up on that information once it was discovered.  EGC says nothing about the fact that the information regarding the alleged server in India proved to be erroneous as described by Mr. Patel, which, when disclosed to EGC resulted in the response "What is the problem?" EGC takes no responsibility for inaccurate information that sent Plaintiffs on a goose chase or that the inaccurate information EGC provided to Plaintiffs sent Plaintiffs down a rabbit hole that EGC knew was empty.  Perhaps most surprising about all of this is that EGC returns to the false India server and phone line provider stating that "Counsel went even further by providing information regarding dialers used by non-party Team Integrity, … which were

entities known as Perfect 10 and Uconnect." ECF No. 168 at 7.  Finally, EGC points to its February 2020 letters to two other vendors, not explaining why it took a year to send these preservation letters. *Id*.

EGC ends its response to Plaintiffs' Motion arguing that even if the Court finds that EGC failed to comply with its duty to preserve evidence, the Court should find that EGC acted in good faith and the Court should choose the least onerous sanction available corresponding to the lack of willfulness in which EGC engaged.  *Id*. 7-8.  EGC also reiterates its financial inability to pay the attorney's fees order, but provides no declaration or affidavit in support of this inability. *Id*. at 9.

   D. <u>Plaintiffs' Reply In Support Of Their Motion For An Order To Show Cause And For Sanctions</u>.

Plaintiffs seek an order holding EGC in contempt for failing to comply with the Court's June 4, 2020 Order to pay attorney's fees and costs.  Plaintiffs argue that the generous amount of time EGC seeks to pay the fees and costs should be denied based on financial constraints never mentioned to Plaintiffs prior to EGC's Response to Plaintiffs' Motion.  Plaintiffs point out that EGC's financial contention is in contrast to information available to the public on Linkedin.com on which EGC states it has "a centrally-located corporate team … plus sales offices in every active market."  ECF No. 170 at 3. Plaintiffs are astounded by EGC's "claim that it has taken 'all steps humanly possible' to obtain" calling records pointing out EGC's many failing discussed above.  *Id*. at 3-4.  Plaintiffs state that EGC has not sought default judgment against G-Energy despite the default entered in December 2019, and EGC did not bring a claim against nor issue subpoenas to Team Integrity or its principals, but instead assisted Team Integrity to move to EGC's corporate headquarter location.  *Id*. at 4 citing Morris Deposition Transcript confirming the assistance EGC provided to Team Integrity for the move. Plaintiffs point to the February 2020 preservation letters sent to three downline call providers that were far too late to be effective, and then walks through the fact that nothing has changed since the Court first issued an order in November 2019.  *Id*. at 5-6.  Plaintiffs argue that leniency for payment of fees should be denied, an order finding spoliation should be entered, and Plaintiffs should be awarded additional fees and costs for having to bring the present Motion. *Id*. at 6-7.

## II. DISCUSSION

### A. The Legal Standard For Spoliation.

Spoliation is a serious allegation that courts carefully analyze. Spoliation is defined as:

> the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. . . . A party must preserve evidence it knows or should know is relevant to a claim or defense by any party, or that may lead to the discovery of relevant evidence. . . . The duty to preserve arises not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation.

*Gonzalez v. Las Vegas Metropolitan Police Dept.*, Case No. 2:09-cv-00381-JCM-PAL, 2012 WL 1118949, *5 (D. Nev. Apr. 2, 2012) (internal citations omitted). "To be actionable, the spoliation of evidence must damage the right of a party to bring an action." *Ingham v. U.S.*, 167 F.3d 1240, 1246 (9th Cir. 1999) (internal citation omitted). "[T]he party alleging spoliation has the burden to prove by a preponderance of the evidence that the accused party actually destroyed, altered, or failed to preserve relevant evidence." *U.S. E.E.O.C. v. Wedco, Inc.*, Case No. 3:12-cv-00523-RCJ-VPC, 2014 WL 4635678, *2 (D. Nev. Sept. 15, 2014), *citing LaJocies v. City of N. Las Vegas*, Case No. 2:08-cv-00606-GMN-GWF, 2011 WL 1630331, *1 (D. Nev. Apr. 28, 2011).

A federal court is empowered to sanction a spoliating party under its inherent authority or Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 37. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). The Court may exercise this inherent authority "based on a party's failure to preserve relevant evidence . . . if [the party] had some notice that the evidence was potentially relevant to pending or reasonably foreseeable litigation." *Anderson v. Wal-Mart Stores, Inc.*, Case No. 2:10-cv-02235-GMN-GWF, 2011 WL 4621286, *3 (D. Nev. Oct. 3, 2011) (internal citations omitted). "This is an objective standard that asks not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Spencer v. Lunada Bay Boys*, Case No. CV 16-02129-SJO (RAOx), 2017 WL 10518023, *5 (C.D. Cal. Dec. 13, 2017) (internal citation omitted). "[I]f relevant evidence has been shown to exist, and if the possessor of that evidence was on notice that the evidence was potentially relevant to litigation which was reasonably foreseeable, and if that party failed to take reasonable steps to preserve it, sanctions may be imposed upon that party." *Fernandez v. Centric*, Case No.

3:12-cv-00401-LRH-WGC, 2014 WL 2042148, *4 (D. Nev. May 16, 2014). In contrast, "a party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of its business." *Gonzalez*, 2012 WL 1118949 at *6 (internal citations omitted). Importantly, the duty to preserve is an affirmative duty and requires active involvement of parties. *In re Napster, Inc.*, 462 F.Supp.2d 1060, 1070 (N.D. Cal. 2006 ) (citation omitted); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 522 (D. Md. 2010) ("Whether preservation or discovery conduct is acceptable in a case depends on what is reasonable, and that in turn depends on whether what was done–or not done–was proportional to that case and consistent with clearly established applicable standards.").

As explained in *Brannan v. Bank of America et al.*, "[a] party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence[.]" Case No. 2:16-cv-1004-GMN-GWF, 2017 WL 4031442, at *2 (D. Nev. September 13, 2017) (internal citation an quote marks omitted), *adopted by Brannan v. Bank of America et al.*, Case No. 2:16-cv-1004-GMN-GWF, 2018 WL 1002613 (D. Nev. February 20, 2018).

B.  <u>Spoliation Sanctions Are Awarded</u>.

With respect to the first element of control and duty to preserve, and anticipating EGC's contention that it had "no control" over calling records, the Court finds otherwise. In *CG Technology Development, LLC v. 888 Holdings PLC*, the Nevada District Court stated:

> Control need not be actual control; courts construe it broadly as 'the legal right to obtain documents upon demand.'" *F.T.C. v. Johnson*, No. 2:10-CV-02203-MMD, 2013 WL 5408272, at *3 (D. Nev. Sept. 25, 2013) (quoting *United States v. Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989)). "Control must be firmly placed in reality." *Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d at 1453. If a party in a case can get access to the documents held by a third-party by "request[ing] it" and the third-party not had an issue with producing documents in the past, the documents are in control of the party in the case. *JS Prod., Inc. v. Kabo Tool Co.*, No. 2:11-CV-01856-RCJ, 2013 WL 3364450, at *2 (D. Nev. July 3, 2013).

Case No. 2:16-cv-00856-RCJ-VCF, 2017 WL 3908673, at *2 (D. Nev. Sept. 6, 2017). *See also Prado-Guajardo v.* Perez, Case No. 2:16-cv-00546, 2017 WL 3130420, at *5 (D. Nev. July 24, 2017) ("In particular, the term control, which is broadly construed, includes the legal right of the producing party to obtain documents from other sources upon demand") (internal citation and quote marks omitted); *Bail Busters, Inc. v. Sterling, et al.*, Case No. CV 10-2150, 2011 WL 13269703 (C.D. Cal. Oct. 13. 2011) ("Federal courts have consistently held that documents are deemed to be within a party's possession, custody or control for purposes of Rule 34 if the party has actual possession, custody, or control, or has the legal right to obtain the documents on demand") (internal citations, brackets, and quote marks omitted).

This principle of "control" is extended to a determination of sanctions including spoliation sanctions. *In re NTL, Inc. Securities Litigation*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (citing Fed. R. Civ. P. 34 for the proposition that control "does not require the party to have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action.") (internal citation and quote marks omitted); *see also Goodman v. Praxair Services, Inc.*, 632 F. Supp. 2d 494, 515 (D. Md. 2009) ("[t]he concept of control as interpreted by *In re NTL, Inc. Securities Litigation* in the context of Rule 34 provides the closest analogy to control in connection with a spoliation issue"); *Vaughn v. Grand Brands, LLC*, Case No. 2:19cv596, 2020 WL 5743215, at * 4 (E.D. VA (Norfolk Division) Sept. 25, 2020); *Lofton v. Verizon Wireless*, 308 F.R.D. 276 (N.D. Ca. 2015) (discussing sanctions for spoliation of calling records by a third party).

Here, there is no doubt that EGC had the practical ability to obtain the documents from Team Integrity. In fact, EGC boasts that it did obtain documents from Team Integrity without a subpoena. ECF Nos. 120 at 13 ¶¶ 26-27; 122 ¶ 4(e). EGC calls Team Integrity its "telemarketing arm" and that there is no contract between EGC and Team Integrity because EGC "trusts" this "strategic partner" that it helped move from Florida to EGC's headquarters location in Kansas. ECF No. 170 at 12-19. EGC repeatedly states it did all it could to obtain calling records, but not only is it clear that EGC did not do so, it is clear that other than a single sentence email in February 2019 from an

EGC employee stating "Please make sure all data from this campaign is saved," EGC did nothing to obtain calling records until the Court got involved in November 2019. EGC did no discovery to locate records; nor did it disclose to Plaintiffs the supposed existence of a server in India until December 2019, which disclosure turned out to be, at best, baseless. Moreover, even if EGC did not have practical control over records held by Team Integrity, it had an obligation to ensure its strategic partner preserved records and to ensure the prompt disclosure of the location of calling record at issue in this dispute. *Goodman*, 632 F. Supp. 2d at 515; *Lofton*, 308 F.R.D. at 284.

With respect to the second element needed to demonstrate spoliation, the court in *Brannan* explained that many courts in the Ninth Circuit hold that a "culpable state of mind includes negligence." 2017 WL 4031442, at *2 *citing Reinsdof v. Skechers U.S. A., Inc.*, 296 F.R.D. 604, 628 (C.D. Cal. 2013); *FTC v. Lights of America Inc.*, Case No. SACV 10–1333, 2012 WL 695008 at *2 (C.D. Cal. Jan. 20, 2012); *Housing Rights Center v. Sterling*, Case No. CV-03-859, 2005 WL 3320739 at *8 (C.D. Cal. Mar. 2, 2005); *Cottle–Banks v. Cox Communications, Inc.*, Case No. 10cv 2133, 2013 WL 2244333 at *14 (S.D. Cal. May 21, 2013); and, *Aguirre v. Home Depot U.S.A., Inc.*, Case No. 1:10-cv-00311, 2012 WL 3639074 at *3 (E.D. Cal. Aug. 23, 2012); *see also Rios v. Dollar Gen. Mkt.*, Case No. 2:15-cv-2056-JAD-VCF, 2017 WL 3749495, at *3 (D. Nev. August 29, 2017) ("[a] rebuttable presumption that missing evidence would have adversely affected the party tasked with maintaining it is raised when evidence is willfully destroyed, and an adverse inference may also be drawn when evidence is lost or destroyed through negligence"). Finally, with respect to whether calling records are relevant to the TCPA claim in which alleged calls were made to a putative class of individuals in violation of that law is undisputed and clear.

Here, EGC could not have been more cavalier about ensuring the retention of calling records. In response to the first sets of discovery propounded by Plaintiffs, dated July 18, 2019, EGC produced no such records. ECF Nos. 113 at 5-6; 113-2 ¶ 14; 113-3; 113-4. Counsel at that time said EGC had a dialer and that calling records would be produced. ECF No. 113-1. Then the same counsel, as he was departing representation of EGC stated, EGC did not have calling records. EGC then continued to state it did not have calling records, but it had done all it could to obtain them apparently by sending a single sentence email to Team Integrity in February 2019, and suing G-

14

1   Energy.  Counsel for EGC did not speak to anyone at Team Integrity until December 2019, when it
2   first learned about a server in India that ended up not to exist.  When Plaintiffs pointed out to EGC
3   that the Indian company had not records, EGC responded with: "What is the problem? … Ganesh is
4   confirming that he never dialed for the Sperian campaign.  Am I missing something here?"  ECF
5   No. 164-1 at 84.  The 30(b)(6) deponent for EGC said in his February 2020 deposition that he would
6   be willing to speak to Team Integrity about its dialer (something he apparently had not done over
7   the 13 months since the litigation commenced).  *Id*. at 25.  Also in February 2020, EGC sent out
8   several preservation letters to apparent third parties who may have, at one point, had calling records,
9   but again, none have been produced.  ECF No. 164 at 6  This is not, as EGC decries, all they could
10  have "humanly" done.

11  EGC's conduct is certainly negligent.  Between February and November 2019, EGC did
12  nothing to gather calling records.  In December 2019, when it seems to have first learned of an
13  alleged server in India on which calling records were at one time stored, EGC again did nothing to
14  obtain or preserve what records might be left.  In February 2020, EGC said it was willing to speak
15  to Team Integrity, its strategic telemarketing arm, about its VICI dialer and location of calling
16  records, but as of writing this Order, there appears to have been no follow up to that promise either.
17  These are just some of the things that EGC has not done that could reasonably have been done to
18  attempt to preserve relevant evidence.

19  EGC's conduct was negligent, but the Court finds the conduct was not sufficiently willful to
20  warrant the most drastic measure of striking EGC's answer.  But, the Court has already issued the
21  least drastic sanction of awarding fees to Plaintiffs that have not been paid.  Thus, the Court next
22  considers the middle level of sanction available; that is, issuing a rebuttable presumption against
23  EGC that the evidence, if it had not been despoiled, would have been detrimental to the despoiler.
24  However, "[t]o warrant a rebuttable presumption, [EGC] must have consciously disregarded its
25  obligation to preserve" lost evidence.  *McCabe v. Wal-Mart Stores, Inc.*, Case No. 2:14-cv-01987-
26  JAD-CWH, 2016 WL 706191, *3 (D. Nev. Feb. 22, 2016), *citing Apple Inc. v. Samsung Elecs. Co.,
27  Ltd.*, 888 F.Supp.2d 976, 998 (N.D. Cal. 2012).  That is, EGC "must have willfully destroyed the
28  evidence with intent to harm."  *Demena v. Smith's Food & Drug Centers, Inc.*, Case No. 2:12-cv-

00626-MMD-CWH, 2012 WL 3962381, *2 (D. Nev. Sept. 10, 2012) (internal citation omitted). There is no evidence of willful destruction in this case, despite the level or disregard EGC gave to its duty to preserve relevant evidence.

The Court therefore turns to the last available sanction, which is to enter an adverse inference jury instruction that an offending party destroyed evidence. This instruction tells "the trier of fact that evidence made unavailable by a party was unfavorable to that party." *Lewis v. Ryan*, 261 F.R.D. 513, 521 (S.D. Cal. 2009) (internal citation and quotation marks omitted). The Ninth Circuit provides that:

> a trial court . . . has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior. . . . [H]owever, a finding of 'bad faith' is not a prerequisite to this corrective procedure. . . . [S]imple notice of 'potential relevance to the litigation' [will suffice].

*Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) (internal citations omitted). There is no doubt that EGC was on notice of the litigation, that it knew that calling records would be relevant to the TCPA class action claims, and that reasonable efforts to ensure calling records were properly retained or the location identified were not made.

C.      An Additional Award of Attorney's Fees And Costs Is Granted.

With respect to Plaintiffs' request for contempt, the Court exercises its inherent power to grant an additional award of attorney's fees and costs to Plaintiffs associated with bringing the Motion and supporting the Motion with a Reply. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (the "purpose of civil contempt is coercive or compensatory") (internal citation omitted).

D.      EGC May Pay Fees Due Over Time.

With respect to EGC's request to delay the payment of fees, the Court will allow EGC to pay to Plaintiffs the $19,737.44 in fees previously awarded over a 10 month period, the first payment due on December 1, 2020, and each of the nine payments to follow due on the first business day of each month. Fees and costs awarded pursuant to this Order shall be payable to Plaintiffs as directed by the Court in a subsequent order. Failure to make payment in any given month, absent notice filed

16

with the Court and served on Plaintiffs that is supported by objective evidence of an inability to pay, will be considered further contempt of Court. Multiple failures to pay may result in additional sanctions.

**III.    ORDER**

IT IS HEREBY ORDERED that Plaintiffs' Motion For an Order to Show Cause and For Sanctions Against Defendant EGC (ECF No. 164) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Plaintiffs shall be entitled to a spoliation sanction against EGC in the form of an adverse inference instruction to the trier of fact at the time of trial. The instruction shall state, in sum, that: EGC was in control of calling records – records showing to what numbers calls were made on the Sperian campaign – that are relevant to this dispute. EGC failed to take reasonable steps to ensure such records were preserved. There is a rebuttable adverse inference that such records would have provided information favorable to Plaintiffs.

IT IS FURTHER ORDERED that Defendant EGC failed to comply with the Court's June 4, 2020 Order awarding attorney's fees to Plaintiff. *See* ECF No. 154.

IT IS FURTHER ORDERED that, in accordance with the finding that EGC is not in compliance with the Court's June 4, 2020 Order, the Court orders EGC to pay Plaintiffs their reasonable attorneys' fees and costs associated with bringing their Motion for an Order to Show Cause and For Sanctions Against EGC (ECF No. 164) and Reply (ECF No. 170). Plaintiffs' counsel shall submit a memorandum of fees and costs incurred in bringing the Motion and filing the Reply detailing the activities, hours spent (in tenths of hours), and the rate charged by each attorney who worked on the Motion and Reply. Appropriate redactions from billing records for attorney client privilege and/or work product may be made for the public filing with non-redacted copies of such records filed under seal. Plaintiffs shall submit their memorandum within 14 days of this Order. EGC shall have 14 days to file a response, if any is desired. No reply shall be permitted by Plaintiffs.

IT IS FURTHER ORDERED that Defendant EGC shall pay to Plaintiffs 10% of the $19,737.44 in fees, previously awarded, each month over the next 10 months. The first payment shall be due on December 1, 2020. The subsequent nine payments shall be on the first business day

1  of each month.  Failure to make payment in any given month, absent notice filed with the Court and
2  served on Plaintiffs that is supported by objective evidence of an inability to pay, will be considered
3  further contempt of Court.  Multiple failures to pay may result in additional sanctions.
4       IT IS FURTHER ORDERED that Defendant EGC shall pay to Plaintiffs the additional fees
5  and costs awarded by the Court arising from Plaintiffs' Motion and Reply (ECF Nos. 164 and 170)
6  in such amounts and over such period of time as the Court states in a subsequent order to be issued
7  by the Court.
8       IT IS FURTHER ORDERED that Plaintiffs' request for an Order to Show Cause is DENIED.
9       Dated this 27th day of October, 2020.

_____
ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE