─2:19-cv-00115-RFB-EJY─

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4  ANDREW PERRONG and JAMES          )
   EVERETT SHELTON,                  )  Case No. 2:19-cv-00115-RFB-EJY
5  individually and on behalf        )
   of all others similarly           )  Las Vegas, Nevada
6  situated,                         )  Friday, March 26, 2021
                                     )  8:46 a.m.
7                 Plaintiffs,         )
                                     )  MOTION FOR SUMMARY JUDGMENT
8        vs.                         )
                                     )
9  SPERIAN ENERGY CORP fka
   SPERIAN ENERGY CORP, a
10 Nevada corporation; and
   ENERGY GROUP CONSULTANTS,          *C E R T I F I E D   C O P Y*
11 INC., a Kansas corporation;
   and BAETYL GROUP, LLC, a
12 Texas limited liability
   company,
13
                 Defendants.
14 _____

15

16

       REPORTER'S TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS
17
              THE HONORABLE RICHARD F. BOULWARE, II,
18                 UNITED STATES DISTRICT JUDGE

19

20 APPEARANCES:       See next page

21

22

   COURT REPORTER:     Patricia L. Ganci, RMR, CRR
23                     United States District Court
                       333 Las Vegas Boulevard South, Room 1334
24                     Las Vegas, Nevada  89101

25 Proceedings reported by machine shorthand, transcript produced
   by computer-aided transcription.

2:19-cv-00115-RFB-EJY

1   APPEARANCES:

2   For the Plaintiffs:

3          **ANTHONY I. PARONICH, ESQ.**
           BRODERICK & PARONICH, PC
4          99 High Street, Suite 304
           Boston, Massachusetts 02110
5          (508) 221-1510

6          **ADRIENNE D. MCENTEE, ESQ.**
           TERRELL MARSHALL LAW GROUP, PLLC
7          936 North 34th Street, Suite 300
           Seattle, Washington 98103
8          (206) 816-6603

9   For Defendant Sperian Energy Corp.:

10         **ANA TAGVORYAN, ESQ.**
           **HARRISON BROWN, ESQ.**
11         BLANK ROME, LLP
           2029 Century Park East, 6th Floor
12         Los Angeles, California 90067
           (424) 239-3400

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                    ─2:19-cv-00115-RFB-EJY─
```

1          LAS VEGAS, NEVADA; FRIDAY, MARCH 26, 2021; 8:46 A.M.

2                              --oOo--

3                       P R O C E E D I N G S

4          THE COURT:  All right, counsel.  I'm going to call this

5   case at this point in time.  This is the case of Perrong versus

6   Sperian Energy Corp, et al., Case Number 2:19-cv-115.  Counsel

7   please announce their presence for the record starting with

8   plaintiffs' counsel.

9          MS. MCENTEE:  Good morning, Your Honor.  Adrienne

10  McEntee, Terrell Marshall Law Group, on behalf of plaintiffs.

11         MR. PARONICH:  And good morning, Your Honor.  Anthony

12  Paronich, also on behalf of plaintiffs.

13         THE COURT:  Okay.

14         For the defendant?

15         MS. TAGVORYAN:  Good morning, Your Honor.  Ana

16  Tagvoryan of Blank Rome on behalf of the defendant, Tomorrow

17  Energy.

18         Harrison?

19         MR. BROWN:  Apologies.  Sorry.  I didn't know I was on

20  mute.

21         Good morning, Your Honor.  Harrison Brown on behalf of

22  the defendant, Tomorrow Energy.

23         THE COURT:  Okay.  So let's start with the plaintiffs.

24  Who's going to be arguing this motion?

25         MS. MCENTEE:  Your Honor, Adrienne McEntee on behalf of

—————2:19-cv-00115-RFB-EJY—————

1  plaintiffs.  I'll be arguing against the motion.

2        THE COURT:  Well, right.  So, Ms. McEntee, I want to

3  make sure I'm understanding what your theory of implied --

4  implied authority is in terms of what the elements would be,

5  what would be required, and why it's satisfied here.  There's

6  some back and forth.  And in the defendants' reply they seem

7  to -- to essentially outline some elements that were not

8  discussed by the -- by the plaintiff.  And so they had the last

9  word on the legal theory.  I wanted to give you an opportunity

10  to be able to respond to that and just lay out for me what you

11  believe would have to be established for such a theory of

12  liability to apply.

13        MS. MCENTEE:  Thank you, Your Honor.

14        So for implied actual authority, the principal grants

15  implied actual authority to an agent when the principal's

16  reasonably interpreted words or conduct would cause an agent to

17  believe that the principal consents to have that act done on his

18  or her behalf.  And so what we look at for that, what the

19  Restatement tells us, and this is 2.02, Comment E, you know,

20  whether a principal knew of prior similar actions by the agent

21  and acquiesced in those is one way to determine whether an

22  agent's actions reflect a principal's consent.

23        And, here, from our perspective, there is plentiful

24  evidence that Sperian acquiesced in the calling behavior of the

25  vendors and subcontractors.  There is --

———2:19-cv-00115-RFB-EJY———

1          THE COURT:  So let me just stop you there for a moment.

2    Because there does seem to be here some evidence of the fact

3    that Sperian clearly had some procedures in place to try to

4    mitigate or eliminate unlawful calls.  This is different than

5    cases I've had where there are no procedures.  I've seen cases

6    where there are no procedures.  There's a list and they

7    essentially tell them, "Check the list and make sure there

8    aren't, right, unlawful calls being made."

9          But in this case there was this back-and-forth process

10   about the list allegedly being scrubbed or not.  You're not

11   really disputing that that happened, right?

12          MS. MCENTEE:  At least as to EGC, there's some evidence

13   in the record that, yes, they were scrubbing lists and sending

14   those approved lists to be called.  The problem isn't so much --

15          THE COURT:  Hold on.  Hold on.  I'm sorry.  Let me

16   just -- I just want to make sure.  Let me go -- let me go back

17   and ask you about that.  So as it relates to your theory, your

18   theory would be that even if there's a process like that in

19   place where there is an apparent structure that is in place to

20   address what would be unlawful calls, right, under Federal law,

21   under the TCPA, if there is evidence that notwithstanding these

22   procedures there was some type of implicit understanding that

23   these calls could continue to be made, then the principal would

24   be liable under the theory of implied actual authority.  Is that

25   right?

—2:19-cv-00115-RFB-EJY—

1    MS. MCENTEE:  That's correct, Your Honor.  And DISH

2  tells us that, right.  So for -- you know, even if there's a

3  telemarketer that's otherwise authorized to market on the

4  seller's behalf, if they're engaging in unauthorized conduct and

5  the seller fails to take effective steps to force the

6  telemarketer to cease that conduct, which is what happened here,

7  yes, Sperian can be liable under an implied actual authority

8  theory.

9    And I do want to -- I know Your Honor referenced these

10  new elements and I do want to address those, these new elements

11  that Sperian mentioned, but if the Court has other questions, I

12  want to wait.

13    THE COURT:  Well, I do because I want -- one of the

14  issues is at some -- at some level, right, a principal or an

15  entity has to be on notice of exactly what would make their

16  conduct illegal, right.  One of the issues I think that the

17  defendants raise which is a legitimate issue about this theory

18  is that how could we ever know, right, that we've complied

19  because when we're making this many calls, of course there are

20  going to be some calls that may ultimately be unlawful, and

21  that's -- that's statistically likely.

22    So part of the question is -- for me is there has to be

23  some objective measure beyond the mere fact that the calls were

24  made.  Otherwise, every time a call slipped through the cracks

25  and there's not an immediate termination of the contractor,

1   right, someone's always going to be liable.  And that doesn't

2   seem to me to be -- that would essentially be establishing

3   strict liability for -- for agents for principals.  And I don't

4   see that implied at all in this statute, right.

5        It seems to me implied actual authority, even under the

6   Restatement says, essentially where there's conduct that is --

7   that is ratified or allowed to -- to happen and the agent's

8   aware of that, the principal's aware of that.  And so then what

9   I have to look at is to what extent there were, one, measures in

10  place to address this, to what extent the measures have to be

11  reasonable.  But why would I not just stop there?  Why couldn't

12  I simply find, for example, in this case, "Okay.  There were

13  calls that were made, but there were reasonable measures in

14  place that are -- that are not disputed."  And so the mere fact

15  that one or two calls were made is not in and of itself enough.

16  Otherwise, you essentially create a strict liability standard.

17        MS. MCENTEE:  Well, Your Honor, we dispute that these

18  measures were reasonable.  They were measures, for sure, but we

19  don't think that they were reasonable.  In fact, DISH says --

20  DISH is very clear.  Sellers like Sperian can use third parties

21  to make calls.  There's no dispute over that.  They can do that,

22  but what DISH says, and this is at 6591, they need to exercise

23  reasonable diligence in selecting and monitoring reputable

24  telemarketers.

25        They were not monitoring these telemarketers.  And it's

1  Sperian's failure to implement these measures that required them

2  to diligently monitor the telemarketers that put them in the

3  position they're in now.

4          And, you know, Sperian made this business decision,

5  right, to cut corners with its lead generation program.  That is

6  our position on this.  You know, back in 2016, Sperian actually

7  had a process in place for approving call centers.  They

8  actually had to approve them.  They required vendors to provide

9  information about the dialer that was used, how it would use the

10  dialer, what agents were in place.  And over time Sperian backed

11  away from that type of monitoring.

12          By the time Sperian contracted with EGC in 2017, it was

13  hands off on how the calls were made.  Sperian didn't care what

14  dialer was used, if the calls were spoofed, fabricated, spliced.

15  And in this case the plaintiffs have both received spoofed,

16  fabricated, spliced calls.  We hired an expert who proved this.

17  Sperian also isn't interested in who makes the calls.  And

18  that's the kind of monitoring, right, that DISH says that

19  sellers like Sperian have to engage in.  It outsources these

20  calls to vendors who Sperian knows are then going to subcontract

21  to overseas call centers.  We know this because the contracts

22  expressly authorize it.

23          You know, Sperian argues that that somehow shields it

24  from liability.  The Court in Lushe rejected that argument,

25  right, because under facts that were simpler here, which is that

2:19-cv-00115-RFB-EJY

1  Sperian knew that its vendors were outsourcing these calls, they
2  were communicating direct -- directly with one of EGC
3  subcontractors, TIEG, you know.

4       And so -- so the Court's asking what sort of
5  monitoring, right, does Sperian have to engage in, right.
6  Because Sperian's position here is they're damned if they do and
7  they're damned if they don't.

8       The monitoring was not sufficient, okay, and here's an
9  example.  Sperian's contract allows it to require its vendors to
10 produce evidence of every single call made.  This is not hard to
11 do, by the way.  This is very easy to do.  You export it into an
12 Excel spreadsheet and you send it to Sperian.  Sperian has the
13 ability -- because it's scrubbing all of these numbers.  Sperian
14 has the ability to scrub those numbers against the Do Not Call
15 Registry and to ensure that cell numbers aren't called.  Sperian
16 could ask for evidence of every single call that was ever made,
17 but Sperian didn't ask for it.  The jury could determine that
18 that was by design, right.

19      The way that Sperian's lead generation program works is
20 they only keep track of the calls that make it to a third-party
21 verifier, which is required by law, by the way.  Sperian does
22 not keep track of the multitude of calls made to consumers who
23 were never interested in Sperian's product in the first place,
24 never wanted to be called.  And as a result, unless a caller
25 says that they're actually interested in Sperian's product and

1  they're transferred to a third-party verifier, Sperian can claim

2  it has no idea who made the calls.

3         So, for example, here in this case, Sperian agents

4  called Andrew Perrong 25 times over a two-week period, 25 times

5  on his phone number that had been registered on the Do Not Call

6  Registry.

7         Yet, the only way he was able to learn that it was

8  Sperian calling him was to pretend that he was interested in

9  the -- in the product and actually get to this third-party

10  verifier.

11         THE COURT:  But Ms. -- and, I'm sorry, Ms. McEntee.

12  What is -- and I want to go back through the record.  What is

13  the evidence of the number of other types -- the number of other

14  individuals or calls that were made in this particular record

15  that we have here?  And what was permitted in discovery?

16  Because I know there's some back and forth in discovery.  So

17  what exactly is the evidence in the record that I have before me

18  about the number of other individuals who may have been

19  called --

20         MS. MCENTEE:  Yes.

21         THE COURT:  -- unlawfully?

22         MS. MCENTEE:  Yes, Your Honor.  I can tell you that it

23  starts on page 10 of our brief, and I can -- and I can go

24  through for you -- because there were numerous complaints in

25  this case, Your Honor, numerous complaints.

1          THE COURT:  Well, no, but let me -- let me sort of back

2   up for a moment.

3          MS. MCENTEE:  Sure.

4          THE COURT:  Because you talk about complaints, but

5   complaints isn't actually necessarily reflective of the actual

6   number.  So I want to make sure what I'm understanding is that

7   you use complaints as a verifiable number, but that's not to say

8   that there couldn't be other calls that were made where people

9   just didn't complain, right.  I mean, there are many people --

10          MS. MCENTEE:  Oh.

11          THE COURT:  -- who will get these calls who simply just

12   don't call in to complain about it.  They will, you know, hang

13   up or not do anything about it.

14          And so do we have anything that would distinguish

15   between the actual number of calls that were made that were

16   allegedly unlawful versus people who called in to complain?

17          MS. MCENTEE:  I can tell you -- we don't have evidence

18   in the record, Your Honor, of the number of total calls that

19   were made by Sperian --

20          THE COURT:  Okay.

21          MS. MCENTEE:  -- through the campaign.  And that was --

22   that was a function of the way that the discovery was bifurcated

23   in this case.  So the parties -- the parties -- Sperian asked

24   that this matter be bifurcated.  So that the first aspect of

25   this case was only whether they could be held vicariously liable

─────2:19-cv-00115-RFB-EJY─────

1     to the calls that were to Mr. Perrong and to Mr. Shelton.

2          So we're -- we're not to that point in the case where

3     we would be dealing -- where we would be introducing that sort

4     of evidence, but what I can tell you -- what I can tell you is

5     the number of complaints that there were, if that's helpful.

6          THE COURT:  Well, no, because part of the issue is, and

7     this is sometimes the tricky part with bifurcation, is that from

8     my standpoint the number of actual calls that were made in which

9     Sperian would have known that they were allegedly unlawful is

10    also relevant beyond just these particular individuals to assess

11    potentially the reasonableness or the consent as it relates to

12    this conduct.  And that's why I was asking you these questions

13    because obviously I didn't preside over the bifurcation.  So I

14    wasn't -- I'm not as, sort of, intimately aware of the extent to

15    which this type of discovery would have been available and it is

16    not simply cited in the brief.

17         So, for example, from my perspective, if the evidence

18    would indicate that in addition to these individuals there were

19    a number of other calls that were made that were allegedly not

20    on the, sort of, do-not-call or the scrubbed list and that that

21    ran into the thousands of calls, I mean, I don't know that, that

22    would implicate the reasonableness of the measures or the

23    awareness of them.  And you're telling me you don't have that

24    information.  Is that right?

25         MS. MCENTEE:  No, I do have evidence of complaints.  I

—2:19-cv-00115-RFB-EJY—

1  guess what the -- what you're asking, Your Honor, is the number

2  of -- if there's a total number of complaints.  We don't know

3  the complete number of complaints that were made.  We don't know

4  the total number of calls that were made.

5          The Court might be aware that there's been some pretty

6  substantial spoliation and sanctions motions practice below in

7  this case that Magistrate Judge Youchah has presided over with

8  respect to EGC, and EGC has been sanctioned for -- based on

9  spoliation issues.  And, so, I believe that we may be entitled

10  to an instruction at trial related to that?  So right now, no,

11  we don't have that information.

12          We're going to keep trying to get call information, but

13  I don't -- what I will tell -- what I will say, Your Honor, is I

14  don't think the way that Your Honor's looking at this is

15  necessarily consistent with the way the Ninth Circuit has looked

16  at it.

17          THE COURT:  Well, and that's fine, but you're also

18  asking me to look at this in a way that the Ninth Circuit

19  actually hasn't laid out clearly either, right.  So, I mean, the

20  implied actual authority liability defense has not been as

21  clearly laid out by the Ninth Circuit, right.  So, I am trying

22  to figure this as I go through it and looking at the

23  Restatement.

24          And I do think as it relates to consent or the

25  acquiescence in conduct, knowledge of that and the extent to

—2:19-cv-00115-RFB-EJY—

1  which the conduct has occurred is absolutely relevant, and I

2  wouldn't disagree that the Circuit wouldn't consider that.  I

3  mean, what I am asking about as relates to these calls is to

4  what extent there would be awareness.

5       So, for example, if there was a complete record in

6  which there were 100,000 calls made and these were only 50 of

7  the calls that were made as relates to the measures that were in

8  place, that would, I think, be significant in the context of

9  evaluating consent or not to unlawful conduct.

10      That's the purpose for my questions, Ms. McEntee,

11  because I do think that that would be -- I'm not saying that's

12  the only factor, but I am saying that placing the calls and the

13  number of calls in the context of how many were made and how

14  many were known to be made by Sperian is, I think, highly

15  relevant to this inquiry.  And, so, I would disagree that it's

16  not relevant to the inquiry that -- that you've asked me to

17  engage in regarding this theory of implied actual authority, but

18  go ahead.  I'll let you continue your argument.

19      MS. MCENTEE:  Thank you, Your Honor.

20      So I will say that the record does have evidence of,

21  you know, 12 different incidences of complaints that Sperian

22  knew about on behalf of its vendors that from our perspective

23  they never -- they never investigated thoroughly.  They didn't

24  discipline.  They have the ability to put these vendors on PIPs.

25  They have the availability to suspend these vendors.  They have

2:19-cv-00115-RFB-EJY

1  the ability to terminate these vendors.

2        Kristensen tell us that in fact that is the duty --

3  that is their duty to investigate these complaints once they

4  come in, and Sperian just didn't do it.  A jury could absolutely

5  find that by not -- by not adequately investigating these

6  complaints -- and there are 12 -- there's evidence of 12 of

7  these complaints in the record, Your Honor.  And, again, it

8  starts at page 10 of our brief -- that Sperian did acquiesce in

9  the behavior of its vendors.

10        THE COURT:  Okay.  But, again, my question to you is,

11  sort of, how does -- how do we objectively establish what would

12  be an appropriate number, right, in terms of complaints?  I

13  don't think you're arguing that if there are one or two

14  complaints, that would automatically create an issue for the

15  jury as to, sort of, acquiescence or consent.  That's why I was

16  asking you about these numbers because I think the numbers

17  matter.  Right.

18        Are you saying that even if there were -- even if there

19  were hundreds of thousands of calls made, if there were 10

20  complaints and they weren't acted upon, that that would be

21  sufficient to create liability?

22        MS. MCENTEE:  I am, Your Honor.

23        THE COURT:  So no matter the number of calls that were

24  made, if there are calls that exist that were not acted upon,

25  you think that that's sufficient at least as it relates to the

1  case going to the jury?

2       MS. MCENTEE: I absolutely do, Your Honor.  These

3  were -- these were unlawful calls.  So it doesn't matter if

4  there was one complaint or 100, you know.  These are just the

5  people -- you know, understand, Your Honor, that Sperian was not

6  tracking these calls.  So the folks who are getting called and

7  not making it to a third-party verifier aren't even going to

8  know who to complain to.  It's only the fact that these

9  plaintiffs understand that in order to find out who's calling

10 them they have to get to the second stage where there's a

11 third-party verifier that we're even here.  But for the fact --

12      THE COURT:  But, Ms. McEntee, that goes to my question

13 which is I think in some ways related to whether or not there's

14 discovery that you would want that you didn't get access to to

15 establish that because I think that that's relevant.  And if

16 you're saying to me you don't think there's any other discovery

17 out there because of spoliation and through other issue, that's

18 fine and I will decide it on this record.  But one of the other

19 factors I was considering is to what extent the bifurcation

20 limited discovery that would be relevant for the Court's inquiry

21 on this particular theory.

22      And so let me then try to be more direct about this.

23 Is there discovery you think that you should have been able to

24 obtain that would help to support your -- your theory of implied

25 actual authority in this case?  Because having looked at the

———2:19-cv-00115-RFB-EJY———

1  issue of spoliation, having looked at the fact that this is a

2  new theory, at least in this Circuit, that's something that I

3  considered when I was going through the parties' briefs.

4      MS. MCENTEE:  Certainly, Your Honor.

5      And it was our -- it was our preference that the matter

6  not be bifurcated.  So our preference always in these cases is

7  to not bifurcate discovery because we find that there's so much

8  overlap between the bifurcated phases that it's just not worth

9  it.

10     You know, yes, it would have been terrific if we could

11 have presented evidence to the Court about the total number of

12 calls and been able to tell you exactly how many of those had

13 been unlawful.  We didn't have the benefit of the calling

14 records in this case because of the spoliation back and forth

15 that was going on.  And so we finally are entitled to some sort

16 of spoliation instruction, but that happened well after all the

17 summary judgment briefing was done.

18     I will say that with that instruction, Your Honor,

19 there is an amount of work that we could go back and do to look

20 at the -- to show the phone numbers that were exchanged back and

21 forth between Sperian and EGC to be able to sort of quantify for

22 the Court how many of those calls were unlawful.  If we were

23 given the opportunity to do that, we can do that.

24     THE COURT:  Well, I'm going to ask the -- I am going to

25 ask the defendant about that because one of the things,

1  Ms. McEntee, I am considering is essentially potentially denying

2  this motion and letting the discovery go forward with the idea

3  that it -- the issue could be reraised.  But I think that there

4  is some potential discovery here that would inform the Court's

5  view on this particular theory as applied in this case.

6        And, so, that's why I'm asking you this question

7  because I may allow the case simply to move forward, not decide

8  this issue now, and let it be decided later.  What is your view

9  about that?

10        MS. MCENTEE:  Your Honor, we would be fine with that.

11  I mean, I -- we have certainly done -- again, before we had the

12  spoliation instruction -- and I do want to be clear, that

13  spoliation instruction, because I'm sure Ms. Tagvoryan will say

14  this, this -- the spoliation instruction is specific to EGC; not

15  Sperian.  That doesn't mean it can't be used with respect to

16  this motion from my perspective.

17        But we did do -- we did do initial work, Your Honor, to

18  look at and call the phone numbers that were exchanged.  And we

19  can and do have the ability to do that work to determine how

20  many of those calls that were on those lists that were exchanged

21  back and forth were -- were calls that shouldn't have -- were to

22  phone numbers that shouldn't have been called.  We have the

23  ability to do that.

24        And if that would be helpful to the Court to quantify

25  this issue on the implied actual authority piece, I think that

———2:19-cv-00115-RFB-EJY———

1   would be absolutely reasonable.

2           THE COURT:  Okay.

3           I'm sorry, Ms. McEntee.  I said also I was going to

4   give you an opportunity to respond to these other elements and

5   we haven't gotten to that part, but I'll let you respond briefly

6   to this --

7           MS. MCENTEE:  Sure.

8           THE COURT:  -- notion of the -- one is the idea of the

9   state of mind.  I have to tell you, you know, I'm not convinced

10  that the issue of state of mind as much as an awareness by the

11  agent of the ability to do this without sanction, which is

12  essentially what we've been talking about and I think that

13  you've argued.  So I don't know about how you would establish

14  some sort of subjective state of mind, other than through means

15  of examples by which it was demonstrated that nothing happened

16  to a known transgressor with respect to the conduct, which I

17  think is what you've argued.  And that is my understanding of

18  what would be the theory.  So I don't know if you have anything

19  to add beyond that, but just to give you that guidance.

20          MS. MCENTEE:  No.  And I agree, Your Honor.  I don't

21  think there is any requirement that we have to show the vendor's

22  state of mind.  I will say, though, that in that regard EGC's

23  principal, Rob Morris, talked about -- you know, weighed in on

24  this notion of Sperian's acquiescence.  And at least, you know,

25  to him, Sperian's failure to visit the call centers, the failure

1   to ask for documents when it could have, you know, it -- that

2   said to him that Sperian just didn't care what they did and how

3   they did it.  And that's in the record at Exhibit 3.

4          As to the -- this other -- there are other elements,

5   right, that Sperian -- Sperian sort of created this three-part

6   test that we don't think is supported under the law.  So the

7   other element that they say is somehow required is to show that

8   there was this pattern of conduct over time, and that's just not

9   true.  That's -- Sperian cited this Bank of the West case out of

10  this district, but that interprets Nevada law.  And Gomez tell

11  us that, you know, when we're talking about agency questions

12  under the TCPA, that's going to be governed by Federal common

13  law.  And when we're dealing with Federal common law, we're

14  looking at the Restatement.  And, again, the Restatement tells

15  us that implied actual authority can be shown by circumstantial

16  evidence.  That's not a quote.  But what the Restatement says at

17  2.02, Comment C is, you know, you look at a principal's conduct

18  other than the written or spoken statements.  So circumstantial

19  evidence and, here, it was the acquiescence.

20          THE COURT:  Thank you.

21          All right then.  Who's going to be arguing this for the

22  defendant?

23          MR. BROWN:  Thank you, Your Honor.  Harrison Brown

24  here.  I'll be addressing the elements in the implied actual

25  authority issue.  Then my colleague, Ms. Tagvoryan, will be

1   addressing the opportunity which the plaintiffs had to conduct

2   discovery related to the number of calls and failed to do it.

3          I think, Your Honor, you've kind of hit it on -- the

4   nail on the head when you said that this theory of implied

5   actual authority, which is new here in this Circuit, revolves

6   around implicit understanding that calls could be made.  And

7   Ms. McEntee said that it has to do with words or conduct which

8   cause an agent to believe that the agent can -- can do conduct

9   described of.  And just a second ago, we were talking about the

10  use of circumstantial evidence.  I don't think that we need to

11  use circumstantial evidence here.  If we look at --

12         THE COURT:  Well, let me ask you this question,

13  Mr. Brown.  Why wouldn't it be the circumstantial evidence here

14  would be that there was a change in monitoring procedures,

15  right.  That Sperian didn't actually put in place certain

16  requirements, some of the ones that are identified by the

17  plaintiff.  Those would be requirements that would be

18  reasonable.  They would be reasonably associated with trying to

19  prevent violations of the TCPA.  That was not done here.  That's

20  also undisputed.  It could have been done.  Why isn't that

21  enough for this case to go forward?

22         MR. BROWN:  Your Honor, that would be enough except

23  that wasn't what happened.  We don't need to look at

24  circumstantial evidence when we have objective evidence as to

25  the EGC party's beliefs.  On page 12 of our reply brief we quote

———2:19-cv-00115-RFB-EJY———

 1  from the deposition transcript of the EGC 30(b)(6)

 2  representative, and he said multiple times in e-mails and in his

 3  deposition testimony essentially something to the effect of,

 4  "We're sorry that we messed up and we're going to button up

 5  these issues going forward."  So --

 6            THE COURT:  Mr. Brown, that is subjective CYA after the

 7  fact.  I mean -- I mean, I appreciate why you would argue that

 8  to me, but the fact of the matter is that's not objective.

 9  That's a subjective, right, interpretation and apology, right,

10  afterwards, right.  Objective would be what is the actual

11  conduct.

12            So what -- I mean, the objective to me is what I

13  identified previously.  There were -- there was this process of

14  exchanging back and forth, right, of looking at numbers.  What

15  can you point to me that's subjective?  Because I don't think

16  that someone's saying -- admitting, "Okay.  Maybe we screwed up"

17  -- that's just apart from the fact that, right, Sperian could

18  have actually engaged in certain types of monitoring procedures

19  and they didn't, right.

20            Why can't that be considered?  There were ways that

21  you -- that they could have more specifically tracked this

22  information, and that wasn't done.

23            And there's evidence that they knew how to do it

24  because they had done it previously and that that was changed.

25  Now, I'm not in a position to, sort of, make a factual finding,

2:19-cv-00115-RFB-EJY

1  but why isn't that enough for this case to go forward?

2          And, again, it's not that -- and I want to be clear.

3  It's not that I don't think that there are issues with that, but

4  there's a separate issue about whether or not I decide that as a

5  matter of law now.

6          So I would encourage you to identify what you think in

7  the record are objective indications beyond someone's, sort of,

8  making a subjective statement about what they think was the

9  appropriate conduct.  That's potentially relevant, but, you

10  know, in litigation those types of statements, I have to say,

11  carry little weight for, sort of, after-the-fact determinations

12  about conduct.

13          MR. BROWN:  Sure, Your Honor.  I'll say one thing and

14  then -- and then I'll -- my colleague, Ms. Tagvoryan, will

15  respond because this is laid out in detail in the evidentiary

16  objections.

17          With respect to the one vendor who we've been talking

18  about the whole time -- and to be clear, there are four vendors

19  here.  We've only been talking about supposed failure to monitor

20  one vendor, which was the EGC parties.

21          There was a policy and procedure in place where the EGC

22  parties were required to submit lists to our client.  Our client

23  scrubbed those lists, returned the lists to the EGC parties, and

24  said, "You may only call the numbers on this list and that's

25  it."

2:19-cv-00115-RFB-EJY

1            Mr. Perrong's number was not on any one of those lists.

2    And unless Mr. Perrong reached the third-party verification

3    stage where he said, "Hey, I would like to become a customer,"

4    our client would not know of that otherwise.

5            And I'll let Ms. Tagvoryan address the other places in

6    the record --

7            THE COURT:  But they could have known, right.  They

8    could have required that the information as relates to all calls

9    be tracked, correct?

10            MR. BROWN:  Correct, and they did and they did audit

11    those calls.  And Ms. Tagvoryan can -- can speak to that.

12            THE COURT:  Okay.  So, I'm sorry, I want to go back in

13    the record because maybe -- you're saying that they required

14    that information about all calls be kept by their vendors?

15            MR. BROWN:  That's correct.  They had the vendors keep

16    information about the calls, and they audited a sampling of

17    those calls.

18            THE COURT:  Okay.  Because when I'm looking at the

19    record, maybe I'm misunderstanding something and missing also

20    the plaintiffs' arguments about this, but I'll -- I'll go back

21    and check.

22            But let me make sure I'm understanding, Mr. Brown.

23    Your argument is that as a matter of law the undisputed measures

24    that were in place were sufficient, right, at this point for me

25    to find that there's no implied actual authority theory that

———2:19-cv-00115-RFB-EJY———

1   could go forward, and particularly as it relates to the --

2   again, we are focussed on just the EGC party I think for the

3   most part.  But that obviously would still create liability for

4   your client.  So it's not as if -- if it's one out of four

5   doesn't change that necessarily.  I know you're not arguing

6   that, but I'm trying to focus the argument here.

7           But that's your position that there were sufficient

8   structures in place that are -- that are undisputed,

9   particularly this sort of back and forth with the approved lists

10  that establish that to the extent these calls are made, they

11  were not with the consent of your client.  Is that right?

12          MR. BROWN:  Correct.

13          THE COURT:  Okay.  All right.  Ms. Tagvoryan.

14          MS. TAGVORYAN:  Thank you, Your Honor.

15          I'm not -- I won't repeat -- I won't repeat a lot of

16  what Mr. Brown said.  And I understand the Court's concerns and

17  questions with respect to the implied -- implied actual

18  authority.  I want to hit a few points for you, Your Honor, and

19  then talk about the discovery --

20          THE COURT:  Well, here's what I'll say, Ms. Tagvoryan.

21  I don't normally let two lawyers argue from the same side.  So I

22  will only let you talk about discovery --

23          MS. TAGVORYAN:  Sure.

24          THE COURT:  -- and he can argue the legal parts to me

25  because that's, from what I understood, Mr. Brown's job.

1          MS. TAGVORYAN:  No problem.

2          THE COURT:  I don't let the tag-team go forward

3    normally.  The other issue is, as I said, I want you to address

4    the issue of bifurcation.  I am inclined simply just to -- as I

5    look at this and I look at the issue of spoliation is simply

6    just to let this case continue with its discovery and then

7    resolve all issues at the end and not go forward with the

8    bifurcated structure now.  So --

9          MS. TAGVORYAN:  Understood.

10          THE COURT:  -- help me understand why I shouldn't do

11    that because of what would have been and was available now

12    because that's the question for me.

13          MS. TAGVORYAN:  Absolutely.  So, Your Honor, with all

14    due respect to Ms. McEntee, I think she completely

15    misrepresented the record and the discovery in this matter.  And

16    I understand Your Honor's inclination, but I believe it's based

17    on a misunderstanding.

18          We had several hearings with the Court, Your Honor, on

19    the scope of discovery in this case.  We had motions and we had

20    hearings on the scope of phase one discovery.  It was very

21    specific in -- at those hearings, Your Honor, that phase one was

22    both vicarious liability as to Sperian and its relationship with

23    its vendors as well as call lists, Your Honor.  The Court carved

24    out discovery to discover call lists and call records to allow,

25    Your Honor, for third-party discovery with respect to the

—————————2:19-cv-00115-RFB-EJY—————————

1  vendors and subvendors and subcontractors to allow plaintiffs to

2  be able to subpoena those vendors for call records and more.

3           And the plaintiff --

4           THE COURT:  Ms. Tagvoryan, I guess I want to make sure

5  I'm understanding.  What wasn't going to be allowed?  So, I

6  mean, if we bifurcate --

7           MS. TAGVORYAN:  Oh.  Sure, sure.  The only --

8           THE COURT:  Hold on.  It would help me to understand,

9  like, in terms of what was allowed to also talk about what

10 wasn't allowed, and if there was some back and forth about what

11 wasn't allowed until the second phase, what if anything the

12 plaintiff was asking for that might be relevant to the Court's

13 inquiry now.

14          MS. TAGVORYAN:  Uh-hmm.

15          The only -- the only two things that were not allowed

16 in phase one discovery was the issue of ATDS, which goes to

17 the -- to the elements of plaintiffs' claim, one of them, and

18 class certification issues with respect to suitability --

19 suitability of the named plaintiffs as an example, Your Honor.

20          Everything else was allowed in phase one because the

21 plaintiffs argued it's relevant to vicarious liability,

22 including, Your Honor, the number of calls -- the number of

23 calls that were made by these vendors, the existence of call

24 lists.  In fact, Your Honor, plaintiffs visited the call site,

25 took a forensic expert with them to EGC's call center, and it

1   took images of their -- of their computers and working stations

2   in an effort to get these records, Your Honor.

3           But the plaintiff -- the plaintiffs also subpoenaed I

4   believe, in addition to EGC, Vestra.  Vestra didn't respond, and

5   they never moved to compel, Your Honor.  They never followed up

6   on that subpoena.  That shouldn't be at the fault of Sperian if

7   plaintiffs had one year, one entire year, to conduct discovery

8   as to all of the calls at issue to get the lists with, again,

9   four vendors:  EGC, New Wave, Baetyl, and Vestra.

10          Baetyl never received a subpoena, to my knowledge.  If

11  they did, they certainly didn't move to compel records from

12  Baetyl.  Same with New Wave, Your Honor.  The fact of the matter

13  is they had ample, ample opportunity to discovery these -- and

14  Sperian produced all of its -- all of the call lists in its

15  possession, Your Honor.  They -- we did not object to discovery

16  of any calls to any other potential class members during phase

17  one.  We didn't --

18          THE COURT:  Ms. Tagvoryan, can you talk to me a little

19  bit about why I shouldn't take into consideration some of the

20  spoliation issues here and how that doesn't implicate this

21  inquiry as well.  And give me from your perspective why it

22  wouldn't.  Because, certainly, to the extent there was

23  spoliation there were sanctions.  That would suggest that there

24  was evidence that could have supported plaintiffs' position and

25  that was not kept or destroyed.  I mean, we're not in a position

─────2:19-cv-00115-RFB-EJY─────

1  necessarily to know.

2      But talk to me about why that wouldn't factor in here.

3  Because I think that's significant at least for me to consider

4  when part of your argument is essentially a lack of evidence of

5  a particular element or approach such that as a matter of law I

6  should rule in your favor.

7      And I think part of that is based upon a dearth of

8  evidence or examples of, sort of, consent and knowledge and

9  failure to act by your client.  So I want you just to comment on

10  the spoliation issue with respect to the EGC parties.

11      MS. TAGVORYAN:  Sure.  And we were prepared for my

12  colleague, Harrison Brown, to do that, but I will do that

13  because I know you don't like the tag-teaming.  So I will -- I

14  will do it.

15      Your Honor, the spoliation issue, we briefed it

16  extensively.  I believe Your Honor has -- has the papers, but it

17  was very specific as to EGC and EGC's lack of instruction to

18  G-Energy.  Sperian did not know about G-Energy.  That is not

19  genuinely disputed, Your Honor, and we did -- Sperian did not --

20  was not able to and could not have based on the lack of

21  knowledge ensured retention of records.

22      And at the hearing, Your Honor, with the Court on this

23  issue it was very clear on the record, and I believe we attached

24  the transcript, the Court agreed and said this will not

25  adversely affect any adverse inference that we give on a

—2:19-cv-00115-RFB-EJY—

1   spoliation -- due to spoliation, will not impact Sperian in a

2   negative way.  That was very clear on the record, Your Honor.

3          THE COURT:  Okay.  But that's -- that's something I

4   have to decide separately as relates to dispositive motions.  So

5   I -- with all due respect to Judge Youchah, she was looking at

6   something different, right.  One of the arguments here

7   essentially is that Sperian engaged in a process by which it

8   hired so many contractors and subcontractors that it could then

9   legitimately say, "We're not responsible for what happened down

10  the road," and they wouldn't be keeping records either.  And so

11  essentially the argument is that Sperian effectively insulated

12  itself from such scrutiny by having such a long list of

13  contractors and subcontractors -- subcontractors where there was

14  not an explicit contract that said even if you are a

15  subcontractor -- contractor or subcontractor, you have to follow

16  certain rules --

17         MS. TAGVORYAN:  It did, it did.

18         THE COURT:  -- that included the types of things that I

19  mentioned to Mr. Brown.  And so that's why I am asking you about

20  the issue of spoliation because of the fact that I think it

21  nonetheless implicates the argument here.  And so I am not

22  saying that I would find and do find that Sperian, sort of,

23  intentionally allowed for records not to be kept or destroyed.

24  I don't think that's the issue, but there is a potential

25  consideration about whether or not Sperian through this process

2:19-cv-00115-RFB-EJY

1  understood that it would be much more difficult to be able to

2  both monitor and track any unlawful conduct because of the, sort

3  of, different layers of contractors and subcontractors.

4       So that's why the spoliation to me is relevant, not

5  because I think that Sperian knowingly allowed --

6       MS. TAGVORYAN:  Right.

7       THE COURT:  -- for this.

8       MS. TAGVORYAN:  Right.  So --

9       THE COURT:  But it could knowingly have allowed for a

10 structure as it relates to contractors and subcontractors that

11 would allow for this to happen even if it --

12      MS. TAGVORYAN:  So --

13      THE COURT:  -- didn't direct people to do that.  That's

14 what I want you to speak about specifically.

15      MS. TAGVORYAN:  Okay.  I will.  So, Your Honor, it did

16 have a structure in place for this.  And it did have a policy

17 and procedure in place, Your Honor.  The -- and let me start

18 with the contracts.  The contracts were with the vendors,

19 obviously, not the subcontractors, except the contracts did say

20 that should the vendors hire a subcontractor, they have to

21 ensure that the subcontractors follow the law, follow the

22 guide -- the guidelines and the contract with the vendors, Your

23 Honor, et cetera.  They did require them to retain the call

24 lists.

25      And, in fact, in the record, Your Honor, there -- there

1    is evidence in the record where Sperian both asked to see the

2    call lists of calls that were made by the vendors.  And -- and

3    so the fact -- and the fact of the matter is that EGC's failure

4    to instruct G-Energy to retain call records, Your Honor, goes to

5    only a fraction of -- of the calls and the call lists and the

6    call records that were available and are available, both in the

7    record and by -- and the fact that plaintiffs failed to subpoena

8    and gather more call records.

9            What happened is they said, "Oh, this -- this -- these

10   particular call records by G-Energy are lost and so we're going

11   to stop looking for other call records," Your Honor.  "We're

12   going to stop laying the record for how many calls were at issue

13   in this case, and we're going to -- we're not going to try to

14   show to the Court here are all of, sort of, the calls that were

15   placed wrongfully.

16           And I want to take a step back, Your Honor, and mention

17   that the calls will be wrongful only if, for example, they were

18   called more -- twice -- two or more times and they happened to

19   be on the DNC list, right.

20           THE COURT:  Right.

21           MS. TAGVORYAN:  Or they were called using an ATDS

22   without consent.  Those are the two types of -- and then

23   wrongful calls for purposes of plaintiffs' claims.  And

24   plaintiffs were -- were able and had the opportunity for a year

25   to get more call records, Your Honor, from -- from these vendors

2:19-cv-00115-RFB-EJY

1  and they didn't.  And so to -- and I understand the Court's

2  concern, of course.  There's a potential spoliation issue with

3  respect to one set of -- of call records by this one

4  subcontractor who, again, Sperian did not know about.

5         And I believe that's insufficient insofar as to make an

6  adverse inference that that call record in and of itself would

7  have shown, again, DNC violations and/or ATDS violations as

8  to -- as to Sperian.

9         But going back to Sperian's conduct because for implied

10  actual authority it's -- it's when the -- a business, you know,

11  says one thing, but does another, right.  And, here, Sperian did

12  not do another.  It said one thing and it did it -- and it did

13  what it said, which is it vetted the call lists.  It audited the

14  calls for the first two weeks and two months that the vendors

15  made, Your Honor.  It -- it paused call centers.  It took them

16  off TPV so that they couldn't make calls, Your Honor.

17         It -- it did not pay for any calls that -- I mean, even

18  after the fact, even when sales were made, they vetted and they

19  didn't pay for any calls that they deemed were -- were placed

20  wrongfully.

21         So they did have reasonable protocols in place both

22  before the calls were being made, after the calls were being

23  made, and they were deactivating agents.  So whether the agents

24  happened to be a subcontractor's agents or a vendor's agents,

25  they were deactivating those agents, Your Honor.

————2:19-cv-00115-RFB-EJY————

1        And so the fact of the matter is there was conduct on

2  the part of Sperian.  Of course there was, but all of the

3  undisputed conduct by Sperian creates an impression, and it

4  must, that it did not -- that the agents or the vendors did not

5  have authority.  Whether it's implied authority, whether it's

6  express authority, whether it's after-the-fact ratification,

7  they just -- they didn't have it from Sperian.

8        And -- and when you step back and you look at the

9  undisputed evidence, it's clear that all of Sperian's actions

10  were -- and -- were the opposite of, sort of, giving the vendors

11  authority.  It -- they simply weren't.

12        THE COURT:  Well, let me ask you this question,

13  Ms. Tagvoryan, which is part of this also is a question of at

14  what point the Court makes a determination and at what point a

15  jury would make a determination.  These are very fact-specific

16  things you're arguing to me.  It's different than, for example,

17  you know, some of the legal issues that have come up under the

18  TCPA versus, you know, is a text message that's being

19  transmitted, sort of -- does that create, sort of, legal

20  liability versus, you know, some sort of e-mail blast.  Those

21  are -- those are -- those are inquiries or questions that are

22  more easily subject to a, sort of, legal determination.

23        The other concern I have about this is that these --

24  the arguments you're raising I think are very legitimate and

25  potentially persuasive, but they're very fact-based arguments

 1   that from my perspective are not the types of arguments that

 2   courts generally determine at a motion for summary judgment.

 3        So that's the last question I was going to ask you and

 4   I'll go back to plaintiff, but I don't necessarily disagree that

 5   there are facts here that would support your argument, but I

 6   don't know that there aren't facts here that support plaintiffs'

 7   argument.  And so why should I decide this now?

 8        And notwithstanding I think that there are very

 9   separate issues as relates to class certification because I

10   think that I'm not talking about that in phase two.  But why

11   should I make such a fact-based inquiry and determination then

12   as a matter of law regarding this particular theory of

13   liability?  Why wouldn't I allow this to go forward?

14        MS. TAGVORYAN:  Your Honor, your -- the reason why you

15   should not allow this to go forward is because there are facts,

16   Your Honor.  You're absolutely right.  There are facts.  But the

17   facts are -- the -- the material -- the material facts for

18   purposes of lack of vicarious liability, they're not disputed,

19   Your Honor.  Of course, you know, there are facts in motions for

20   summary judgment as they have to be, but the material fact that

21   Sperian has presented, Your Honor, are not genuinely disputed,

22   and the material facts are that there was conduct by Sperian

23   which negate any notion that Sperian authorized or ratified.

24        And if plaintiffs' argument, Your Honor, is that,

25   "Well, that's not enough," right, and we have -- and Your Honor

—2:19-cv-00115-RFB-EJY—

1   is thinking plaintiffs have presented facts that support their

2   position, respectfully, Your Honor, I don't think plaintiffs

3   have presented any facts -- undisputed facts that have supported

4   their position, even disputed facts.  There aren't any facts

5   because in our evidentiary objections, Your Honor, we lay out

6   plaintiffs not only misconstrue the evidence in the record and

7   introduce, sort of, quotes from deposition testimony that's just

8   plain wrong.

9        For example, they say, Your Honor, Sperian didn't visit

10  a call center.  That's because there's -- there was no control

11  over the call center.  You know, how many agents are on the

12  desks, you know, and all of that is irrelevant because the

13  relevant facts, again undisputed, did Sperian authorize or allow

14  two or more calls on DNC lists?  Did Sperian allow ATDS calls,

15  you know, off of approved lists?  And the answer is no.

16       And plaintiffs' facts, if they have any, are not -- are

17  not material.  They -- and they're just not genuine, Your Honor.

18       And one more thing is this notion of, well, Sperian

19  had -- should have had specific monitoring procedures.  Well, it

20  did.  Or Sperian moved away from something it did in 2016, you

21  know, in 2019.  I want to address that really quick just for the

22  record because I know there's a court reporter here, Your Honor.

23       The 2016, sort of, sheet questionnaire that plaintiffs

24  are referencing, that was not discussed in depositions.  There

25  is no witness to it.  And all -- and it's just one document that

─────────2:19-cv-00115-RFB-EJY─────────

 1  was produced in discovery by Sperian with absolutely no

 2  foundation whatsoever, Your Honor.

 3          One questionnaire that somehow became this argument

 4  that, "Oh, they had a procedure in 2016 that they didn't -- that

 5  they backed away from in 2019," and that's simply not true.  It

 6  was not a procedure.  You can't call one questionnaire, sort of,

 7  a procedure or policy or practice, right.

 8          THE COURT:  So, I'm sorry, Ms. Tagvoryan.  What was

 9  your understanding of the purpose of the questionnaire, then?

10          MS. TAGVORYAN:  The questionnaire, Your Honor, was,

11  first of all, not signed.  It came from a time period that's not

12  a relevant time period.  And it came before the relevant actors

13  at Sperian were at Sperian, for example, Mr. Moya, the chief

14  executive officer -- the chief legal officer.

15          I mean, it was just -- if we're looking at implied

16  actual authority, you know, conduct, knowledge, and all of --

17  all of that on -- on behalf of Sperian, Your Honor, we have to

18  look during the relevant time period.  And if there's no

19  foundation for a procedure in the past, you -- that is not --

20  and you can't prove it, you know, that's not relevant for

21  purposes of our analysis here.

22          THE COURT:  So you're saying that they had an

23  opportunity to be able to explore that as well in this phase and

24  they didn't do that?

25          MS. TAGVORYAN:  Yes, that's correct, Your Honor.

2:19-cv-00115-RFB-EJY

1          THE COURT:  Okay.  All right.  Thank you,

2  Ms. Tagvoryan.

3          Ms. McEntee, I want to give you an opportunity to be

4  able to respond particularly to the argument about, sort of,

5  misconstruing prior procedures, but also the argument about

6  there not being any evidence disputed that would suggest that

7  Sperian didn't take appropriate measures as it could have.

8          MS. MCENTEE:  Sure, Your Honor.

9          Well, this call center log, I want to talk about this

10  first, this call center questionnaire.  It did in fact come up

11  in Mr. Moya's deposition.  He had never seen it before, but it

12  was his job as the 30(b)(6) representative to actually ask about

13  that document and he did not.  He did nothing to satisfy his

14  obligation as a 30(b) witness to testify about what that

15  document meant.

16          As far as the concerns about authentication, Sperian

17  produced it.  Sperian produced it in discovery.  So the notion

18  that they are distancing themselves from it now and they don't

19  know what it means and we just don't know, that is very

20  convenient, Your Honor.  They produced it in discovery.  It was

21  part of their system.  They just decided they didn't want to

22  testify about it.

23          But, in fact, Rob Morris signed that call center

24  document.  It was certainly before EGC had been hired, but it

25  was within the class period.  So this notion that the call

 1  center questionnaire is not relevant is a complete red herring.

 2          I do want to address this idea that -- that Mr. Brown

 3  mentioned, this representation, because this is a very important

 4  one, that Sperian required its vendors to keep call logs.  That

 5  is -- that is not true.  That is absolutely not true.  And, in

 6  fact, we asked Mr. Moya about that during his testimony.  And I

 7  will give you a specific cite because it's so important, and

 8  this is Exhibit --

 9          THE COURT:  Okay.  And is this in the record?

10  Because --

11          MS. MCENTEE:  It is.

12          THE COURT:  -- partly I need to be able to -- to follow

13  along because you all certainly do have some differing views

14  about some of the disputed facts in this record.  So if you can

15  give me a specific cite for the record.

16          MS. MCENTEE:  I will, Your Honor.

17          THE COURT:  I'll give you an opportunity to be able to

18  come back to this to also to make a reference or to have -- to

19  offer the Court a cite.  But go ahead, Ms. McEntee.

20          MS. MCENTEE:  Sure, and I do have a specific cite for

21  you.  It's Exhibit 2 of our exhibits, and this is Mr. Moya -- an

22  excerpt from Mr. Moya's --

23          THE COURT:  I'm sorry.  Which document is this again?

24          MS. MCENTEE:  This is Exhibit 2.

25          THE COURT:  To your response?

2:19-cv-00115-RFB-EJY

1          MS. MCENTEE:  That's correct.  And it's Edgar Moya's

2    deposition transcript.

3          THE COURT:  Hold on.

4          MS. MCENTEE:  Starting at page 181.

5          THE COURT:  Just let me get there.

6          MS. MCENTEE:  And I can probably -- I don't know

7    whether Your Honor is tracking the index or -- because that

8    might be helpful, too.

9          If you need a specific page number.

10          THE COURT:  No, no, no.  I just -- give me a moment

11    just to pull this up.

12          And, I'm sorry, which page number in the deposition?

13          MS. MCENTEE:  Page 181.

14          THE COURT:  Okay.  Hold on a second.

15          (Pause.)

16          THE COURT:  I'm sorry.  You said it was for Exhibit 2?

17          MS. MCENTEE:  That's correct.  Exhibit 2 and page 181

18    of the excerpt.

19          THE COURT:  When you say "Exhibit 2," are you talking

20    about the doc -- the exhibit attached to the document that was

21    filed?  Hold on.  Because when you -- I want to -- hold on.

22    This is not right.

23          Right, there is -- there are essentially exhibits

24    according to ECF, and there are exhibits that you separately

25    marked in your response.  Are you talking about your

—2:19-cv-00115-RFB-EJY—

1  separately-marked exhibit?

2          MS. MCENTEE:  That's correct, Your Honor.

3          THE COURT:  All right.  Hold on then.

4          MS. MCENTEE:  And there are -- I think that we put some

5  sort of Bates numbers at the bottom --

6          THE COURT:  Right.

7          MS. MCENTEE:  -- of the pages, and if that's helpful, I

8  have that citation for you as well.

9          THE COURT:  That would be because for some reason this

10 is not coming up properly.

11         MS. MCENTEE:  Okay.  So that starts at -- so it starts

12 at Plaintiff's MSJ 14.

13         THE COURT:  Okay.  And I'm sorry.  And what exhibit of

14 the deposition again?  I mean, what page of the deposition

15 itself?

16         MS. MCENTEE:  181.

17         THE COURT:  Okay.  Hold on.  Here we go, I think.

18         181?  Because I just see a 170 ... I'm sorry.  This

19 is -- not 191?  It's 181.  Is that what you're saying?

20         MS. MCENTEE:  Yes.

21         (Pause.)

22         THE COURT:  And why don't you just go ahead and read

23 from it --

24         MS. MCENTEE:  Sure, sure.

25         THE COURT:  -- instead of pulling it up.

—2:19-cv-00115-RFB-EJY—

1        MS. MCENTEE:  And so the background -- and this relates

2   also, Your Honor, to Exhibit 13 of our exhibits.  So I'm showing

3   Mr. Moya Exhibit 13.

4        THE COURT:  Okay.

5        MS. MCENTEE:  "Do you recognize this e-mail?"

6        "I don't.  I don't remember it."

7        "So the content says call log.  Looking on the back

8   here, the excerpt, does that look like a call log to you?"

9        "Yeah, it looks that way.  It looks like there's phone

10  numbers."

11       "Was it common for Sperian to ask its vendors to send

12  over call logs?"

13       "No, it's not."

14       And for the record, Your Honor, that -- that Exhibit 13

15  that we're talking about here in this deposition was the only,

16  only example of a call log we found going to Sperian from any

17  vendor in this case.  Sperian did not require its vendors to

18  keep track of the calls made by the vendors or the

19  subcontractors, did not require them to do so.  And that is

20  precisely the reason we ended up with this spoliation situation

21  we're in with EGC.  It's precisely the reason why we're -- we

22  are fighting still to get call logs.

23       There's no misrepresentation here.  We --

24  Ms. Tagvoryan's correct that we did have the ability to get call

25  records below, and we did take steps to do that, and we did

1    issue subpoenas.  And, you know, if we do get to phase two in

2    this case, which is normally what we use those call records for

3    is for class cert, we will move to compel as needed for those

4    vendors just like we did with EGC and ended up with the

5    spoliation instruction.

6         But there's no evidence that Sperian required them to

7    keep these call logs.  And, in fact, their own representation --

8    representative said they didn't.  And that's why we're in this

9    position we're in where the only reason Sperian's illegal

10   behavior was uncovered was because we were dealing with

11   plaintiffs who actually know how to navigate these TCPA cases.

12   It's because of this structure that Sperian set up to insulate

13   itself from these calls the downstream vendors are making.

14        The very fact that they're not requiring their vendors

15   or subcontractors to keep track of the calls means they can have

16   plausible deniability, except that DISH says that's not good

17   enough.  You have to do more monitoring than what Sperian was

18   doing.

19        A jury could conclude that Sperian didn't adequately

20   monitor its vendors.  A jury could conclude that Sperian didn't

21   adequately investigate the complaints or red flags; of which

22   there were numerous.  A jury could conclude Sperian didn't

23   discipline the vendors when it should have.

24        None of these vendors were terminated until they were

25   sued.

1          And here's the big, sort of, fact that hasn't been

2    mentioned yet, Your Honor.  Not only did Sperian not discipline

3    these vendors by terminating them after these complaints came

4    in, even after the lawsuit happened, even after Mr. Perrong sued

5    and then Mr. Shelton joined later, each of them then got

6    additional calls from Sperian.  That is how broken Sperian's

7    system is.

8          A jury could conclude that by failing to discipline

9    these vendors Sperian acquiesced in the behavior of these

10   vendors.  A jury could conclude that Sperian accepted the

11   benefits of these campaigns while knowing that some of the calls

12   may have violated the TCPA.

13         I mean, they accepted over 18,000 contracts from EGC in

14   2018 alone while these complaints were coming in.  This is a

15   jury question, Your Honor, and we ask that you deny summary

16   judgment.  And if the Court has other specific questions you

17   would like me to address with respect to anything that

18   Ms. Tagvoryan mentioned, I would be happy to do that.

19              THE COURT:  Thank you, Ms. McEntee.

20         Mr. Brown, I don't know if you wanted to be able to

21   respond directly to the issue that Ms. McEntee raised regarding

22   Mr. Moya's deposition or the specific issue about whether or not

23   there were any other call logs that were produced in this

24   litigation.  I'll give you an opportunity to be able to do so.

25              MR. BROWN:  Sure.  Very briefly, Your Honor.

1           I'm going to -- there was a long quote that Ms. McEntee

2    read.  I just want to highlight three lines here, lines 10

3    through 12 on page 181.

4           THE COURT:  Before you do that, can you just clarify

5    for me, did Sperian have other call logs from other vendors?

6    Were any other call logs produced?  And if they weren't, why

7    were they not?

8           MR. BROWN:  Sperian produced everything that it had,

9    and as this --

10          THE COURT:  Okay, Mr. Brown.  That's actually not my

11   question.  My question is, other than the call log that was

12   identified, did Sperian produce any other call logs from

13   vendors?

14          MR. BROWN:  I believe there were other call logs that

15   were attached to e-mails between Sperian and the vendors that

16   were produced.  I would have to check the record and let Your

17   Honor know, but I'm fairly certain there were.

18          THE COURT:  Okay.  All right.  I'm sorry.  Go ahead and

19   read from the deposition excerpt.

20          MR. BROWN:  So, Ms. McEntee, has made a point of saying

21   a couple of times now Sperian did not require its vendors to

22   keep call logs.  That is not reflected in the quote that she

23   read to you from Mr. Moya.

24          The question:  "Was it common for Sperian to ask its

25   vendors to send over call logs?"

1          "No, it's not."

2          That's different than did Sperian require its vendors

3    to keep call logs.  And there's been no affirmative showing that

4    there's a triable issue on that fact by the plaintiffs.

5          The second question regarding the subpoenas, as

6    Ms. Tagvoryan said -- and I don't want to beat a dead horse here

7    so I promise I'll be brief.  As Ms. Tagvoryan said here, there

8    was over a year in which to collect call logs.  The plaintiffs

9    focussed on one single vendor, the EGC parties.  They knew about

10   the EGC parties' subcontractor, G-Energy, who's also a party to

11   this case by way of a third-party complaint by EGC parties.

12   They never took discovery of G-Energy.  They knew about New

13   Wave.  They never subpoenaed them.  They knew about Vestra.

14   They subpoenaed them, but then they never enforced it over six

15   months after issuing the subpoena.  They knew about Baetyl who

16   was a party to this case.  They never subpoenaed them.  And they

17   also knew about the additional subcontractors of these vendors,

18   and they never subpoenaed them.

19          So to say that, yes, we subpoenaed them and we

20   didn't -- we couldn't get anything is just wrong.  And, number

21   two --

22          THE COURT:  Part of it, Mr. Brown, is why doesn't

23   Sperian have this information.  Part of their argument is your

24   client should have kept it, right, that the whole structure's

25   created specifically to do exactly what's happening in this

1  case, which is make it difficult to obtain records through

2  established compliance.  Right, that's part of their argument.

3  That that's a knowing way that this was structured.  And so how

4  would you respond to that?

5          Because this is playing out exactly -- if I were to

6  accept that theory, this is playing out exactly as one might

7  think if that's what the intent was that Sperian gets to say,

8  "Well, we don't have the records.  Someone else has the

9  records."  And if they want to those records, they have to go

10  after 50 different companies to get the records.

11          Why wouldn't that be something that, in fact, a jury

12  could take into consideration about the structure as it relates

13  to monitoring vendors and subcontractors?

14          MR. BROWN:  Because, Your Honor, there is more than one

15  way to build and develop and maintain a TCPA compliance program.

16  And our client did that.  Our client required the vendors to

17  provide recordings of calls, and they audited a sampling of

18  those calls.  Our client provided policies and procedures that

19  had to be followed, and when they weren't followed, they

20  disciplined those vendors.

21          Ms. McEntee -- one other point.  Ms. McEntee made a

22  point of saying that even after this case the calls continued.

23  That's true, but it's not the full picture.  There were multiple

24  vendors, as we know.  No additional calls were received by

25  Mr. Perrong or Mr. Shelton from the vendors who were part of the

—2:19-cv-00115-RFB-EJY—

1    original complaint.  The calls that they received were from

2    first-time offenders from other vendors.  And when those

3    first-time offenders came through, Sperian immediately put a

4    stop to them, but there had been no prior -- no prior instances

5    of wrongdoing by those vendors.

6         So essentially instead of -- and I can understand if

7    Ms. McEntee wants to say, "Okay.  Well, you know, the policies

8    and procedures that Sperian had in place were not enough.  Three

9    strikes and you're out."  There's -- they're suggesting that

10   it's a one-strike-and-you're-out policy -- theory of liability,

11   Your Honor.

12        And that's just -- that's not supported by the law.

13        THE COURT:  Okay.  Thank you.  Just give me a moment

14   here to look at my --

15        MS. TAGVORYAN:  Your Honor, can I put something really

16   quick on the record with regard to the call logs?

17        THE COURT:  I think at this point I'm going to -- I am

18   going to close the argument.  I just want to go back and look at

19   my notes here.  Thank you, though.

20        (Pause.)

21        THE COURT:  Here's what we're going to do in this case.

22   I'm denying the motion for summary judgment without prejudice.

23   I find that at this point in time because of the bifurcation of

24   the discovery there's certain information that the Court does

25   not have access to that is necessary for it to make this

—2:19-cv-00115-RFB-EJY—

1  determination.  I'm going to order that this case proceed.  I'm

2  also going to order to the extent that it's relevant that the

3  30(b)(6) deponent for Sperian be redeposed regarding these

4  issues of the prior procedures and the call logs in particular.

5  I don't find it acceptable that this 30(b)(6) deponent, when I

6  went back and looked at least at some of the cites, didn't have

7  information about certain policies and procedures and didn't

8  have information about certain logs, unless I'm missing

9  something.

10      Now, part of this is that the parties cited different

11  parts of the deposition, and so I don't have a full deposition

12  which was why I was trying to go back and forth in the record.

13      But the Court finds in this case that unfortunately the

14  bifurcation in this case has left it without important and

15  necessary information to decide this particular legal issue.  So

16  I'm going to again deny the motion for summary judgment.  I'm

17  going to allow, again, for this 30(b)(6) deponent to be

18  redeposed, Ms. McEntee.  If there are issues that you

19  specifically want to identify that were not previously known,

20  then you should identify those, and I'm going to direct that

21  this deponent familiarize himself or herself with this

22  information and be able to speak knowledgeably about those

23  particular issues as it relates to monitoring procedures, call

24  logs, other compliance procedures.

25      I'm just saying this to you, Mr. Brown, because I'm not

—2:19-cv-00115-RFB-EJY—

1  going to find it to be acceptable that this deponent not provide

2  answers that the deponent should know about as relates to these

3  procedures.  And they should review the records to be able to

4  make a definitive statement one way or another about what those

5  policies and procedures were.

6       Because that's part of the reason why it's difficult

7  for me to make a determination now.  So we're going to make sure

8  that this gets done properly when discovery continues in this

9  case.

10       Ms. McEntee, is there any other particular information

11  that you think would be necessary for the Court to order as

12  relates to the prior procedures and monitoring with respect to

13  Sperian and its subcontractors?

14       MS. MCENTEE:  Not at this time, Your Honor.

15       THE COURT:  All right.  How long do we think that the

16  second phase or the continued phase of discovery will take?

17  I'll start with you, Ms. Tagvoryan.

18       MS. TAGVORYAN:  Your Honor, the continued second phase,

19  is that -- is that still limited to the issue of vicarious

20  liability?

21       THE COURT:  No.

22       MS. TAGVORYAN:  And the case will be proceeding into

23  phase two with respect to all of the issues in the case?

24       THE COURT:  Yes.  Vicarious liability will remain an

25  issue, and you will be able to reassert this issue at the close.

2:19-cv-00115-RFB-EJY

1           And what I will tell you is this, Ms. Tagvoryan and

2    Mr. Brown.  You can at any point in time file a partial motion

3    for summary judgment on this issue with the understanding,

4    however, that you only get to do that once again.  So if

5    discovery's still ongoing and the plaintiffs come back and say,

6    "Look, there's still other information out there that we think

7    would be relevant," and you don't have it and I say -- and I

8    agree with that, then I'm going to deny the motion and you can't

9    bring it back up.

10           I just want to give you an opportunity if you feel like

11    you've gotten to a point where you're -- you have enough

12    evidence or there's some definitive evidence that would

13    establish something, you're free to raise the issue before

14    discovery closes on this one issue with the understanding that

15    you can only do that once.  So I don't want to have a partial

16    motion for summary judgment and then at the end, Ms. Tagvoryan,

17    and Mr. Brown, another one, right.

18           But I do think that there may be and hopefully

19    information that comes out of further discovery that may allow

20    for there to be some closure on this particular issue as it

21    relates to that.  I just want to be clear.  I don't normally,

22    again, allow for partial motion for summary judgment on those

23    types of issues, but in this case I expect the -- some of the

24    discovery regarding, sort of, class cert may be so completely

25    different categorically that there may be a point in time,

1   Ms. Tagvoryan and Mr. Brown, where you feel that the additional

2   information that's been produced from discovery is sufficient to

3   be able to make a subsequent argument.  I'll leave that to your

4   discretion as to when you would file that.

5           MS. TAGVORYAN:  Understood, Your Honor.

6           So with respect to the partial motion for summary

7   judgment, if we were to file one, what Your Honor is saying is

8   that we -- Sperian can file another motion on the vicarious

9   liability issue which -- a motion for summary judgment on that

10  issue during the pendency of phase two, and then later we'll be

11  able to file a motion for summary judgment on -- on the merits

12  of the case, but cannot reargue vicarious liability in that

13  second motion of phase two, which is really the third motion if

14  we count this motion that's already been filed?

15          THE COURT:  Yes.

16          MS. TAGVORYAN:  Okay.  Understood.

17          And so with respect to the -- the -- how long will the

18  parties need, Your Honor, I think it might make sense to meet

19  and confer with plaintiffs and come up with a -- a proposed

20  schedule for the Court, Your Honor, with regard to phase two.

21  It sounds like there will not be a phase three.  Phase two is

22  going to encompass the rest of the -- of the issues in this

23  case.  And so we'll need to meet and confer and talk about how

24  we want to -- to structure that, Your Honor, because it does

25  include both merits discovery as well as class certification

─────2:19-cv-00115-RFB-EJY─────

1  discovery at this point.

2          THE COURT:  That's correct.

3          And, Ms. McEntee, I want to be clear.  Part of the

4  reason why I'm ordering this discovery to continue relates to

5  some of the issues that -- that were encountered in discovery by

6  the plaintiffs.  However, once we get to the close of discovery,

7  discovery will be closed and so you wouldn't be able to argue

8  some of what you have argued to me successfully today about what

9  would have happened or what could have been gleaned as relates

10 to a larger discovery process.

11         I'm saying that because it's not as if I didn't find

12 some of the arguments from the defendants persuasive, but it is

13 that we're at a summary judgment stage and the standard is

14 different.  But at the point in which discovery is closed, sort

15 of arguing to me that we -- that there's still discovery that we

16 could have obtained that would have been relevant, but did not

17 obtain in this phase will not actually be an argument you can

18 raise.  You understand that?

19         MS. MCENTEE:  Yes, Your Honor.

20         THE COURT:  So I'm saying to the extent you want to

21 raise issues about anything regarding vendors, subcontractors,

22 and records or documents, this phase is the phase to do it.

23 There will be no other phases or extensions as it relates to

24 this discovery.

25         MS. MCENTEE:  Understood, Your Honor.  And we think

—2:19-cv-00115-RFB-EJY—

1  probably six more months of discovery would be in order to be

2  able to complete discovery, this discovery process.

3         THE COURT:  Okay.  I'll allow you all to meet and

4  confer and submit a discovery schedule within two weeks.

5         MS. MCENTEE:  Thank you, Your Honor.

6         THE COURT:  Okay.

7         Is there anything else we need to do today,

8  Ms. McEntee?

9         MS. MCENTEE:  Not from my perspective.  Thank you.

10         THE COURT:  Mr. Brown?  Ms. Tagvoryan?

11         MS. TAGVORYAN:  Your Honor, with respect to the

12  briefing on the spoliation issue, Your Honor, I believe that

13  motion is still pending, and I'm not sure if the Court is going

14  to hold that in abeyance.  It just -- that would be helpful to

15  know going into scheduling for -- for phase two and then also to

16  sort of preempt any -- any discovery disputes that might arise

17  from the arguments regarding that.

18         THE COURT:  Okay.  When you say -- when you say it

19  would be helpful to know, what exactly?

20         MS. TAGVORYAN:  Is the -- I'm sorry.  Is the Court

21  planning -- intending to rule on that motion or will that be

22  held in abeyance?

23         THE COURT:  Well, and -- and if the question is about

24  an instruction or is the question about other types of

25  information that might be ordered?  I'm not sure because the

1  Court has some discretion as it relates to relief that it might

2  order if I were to make such a finding.  And I'm not sure,

3  Ms. Tagvoryan, if you're inquiring about a specific form of

4  relief that you think may inform these discussions or just

5  generally deciding the motion.

6        Because, as you know, for spoliation there can be

7  different types of sanctions.  One can be an adverse inference

8  instruction or finding at different stages of the litigation,

9  and then there can be just explicit monetary sanctions.  So I'm

10 not sure if you're inquiring about a particular form of relief.

11       MS. MCENTEE:  Your Honor --

12       MS. TAGVORYAN:  The relief that we requested, Your

13 Honor, in the -- in our objections is to modify the adverse

14 inference instruction on page 17 of -- of the magistrate judge's

15 order, Your Honor.  And that is the relief that I suppose is

16 still pending, Your Honor, and that could be something that if

17 the Court says we'll revisit that at the conclusion of phase

18 two, for example, then -- then that's fine, Your Honor.

19       THE COURT:  Okay.  That's -- I wasn't sure if you

20 just -- if you were inquiring about that specific request.  It

21 would be my intention at this point to deny that without

22 prejudice until the discovery is completed.  I think at that

23 point issues of spoliation -- of spoliation could be adequately

24 addressed by the Court because the Court could then address

25 their impact on the overall litigation in this case.

2:19-cv-00115-RFB-EJY

1            And, I'm sorry, Ms. McEntee.  Were you going -- were

2  you going to say something else?

3            MS. MCENTEE:  I was, but I don't need to.  Thank you.

4            THE COURT:  Okay.  Because those issues can be reraised

5  by both sides, but I think now that discovery's going to

6  continue we'll have discovery closed.  The appropriate time for

7  them to be raised is at the end of discovery.

8            MS. MCENTEE:  Thank you, Your Honor.

9            THE COURT:  Okay.  Again, as I said, I'll give you all

10  two weeks to submit a discovery schedule to Magistrate Judge

11  Youchah and myself for approval.  Okay?

12            Is there anything else we need to do today?

13  Ms. McEntee?

14            MS. MCENTEE:  No, Your Honor.

15            THE COURT:  Mr. Brown?

16            MR. BROWN:  Not on our side.

17            THE COURT:  Ms. Tagvoryan?

18            MS. TAGVORYAN:  No, Your Honor.  Thank you.

19            THE COURT:  Thank you all for your discussion today.

20  Everyone, please be well and be safe.  We'll be adjourned.

21  Thank you.

22            MR. BROWN:  Thank you, Your Honor.

23            (Whereupon the proceedings concluded at 10:04 a.m.)

24

25

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

2:19-cv-00115-RFB-EJY

--oOo--

COURT REPORTER'S CERTIFICATE


        I, PATRICIA L. GANCI, Official Court Reporter, United

States District Court, District of Nevada, Las Vegas, Nevada,

certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.


Date:  April 12, 2021.

                                    /s/ **Patricia L. Ganci**

                                    Patricia L. Ganci, RMR, CRR

                                    CCR #937